**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| WEST VIRGINIA RIVERS COALITION and WEST VIRGINIA HIGHLANDS CONSERVANCY, <br><br>     Plaintiffs, <br><br> v. <br><br> AMSTED GRAPHITE MATERIALS LLC, <br><br>     Defendant. | No. 1:26-cv-00046-TSK |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S MOTION TO DISMISS COMPLAINT**

The Court should dismiss the Clean Water Act ("CWA") Complaint filed by Plaintiffs West Virginia Rivers Coalition and West Virginia Highlands Conservancy ("Plaintiffs") because their citizen suit violates numerous constitutional provisions. Congress's enactment of 33 U.S.C. § 1365—the statute under which Plaintiffs pursue this case—upsets the balance struck by the U.S. Constitution's Framers. In 1787, they vested the executive power in a President and established Executive Branch unity by giving the President the power to appoint, oversee, and remove subordinates. The Framers feared that a plural executive would lead to second-guessing of the President's decisions. Although the Framers chose this arrangement, Congress in 1972 shattered Executive Branch unity with CWA citizen suits, which allow private actors to exercise executive power. And that is what happened here: despite being notified by Plaintiffs of the alleged violations in December 2025, the President's subordinates did not bring an enforcement action in federal court. That should have been the end of the story. But because Congress undermined the President's prerogatives, Plaintiffs—who think they know better than the President, Department of Justice ("DOJ"), and U.S. Environmental Protection Agency ("EPA")—were allowed to bring

1

the very claim the Executive declined to pursue. This is not an isolated incident, as this is the seventeenth CWA citizen suit Plaintiffs have filed since 2007, second-guessing the Government.

But Congress's allowance of private plaintiffs to vitiate the President's enforcement decisions is not the worst aspect of citizen suits. By allowing private individuals who are not part of the federal government to exercise executive power, such suits also threaten the liberty and accountability our Framers sought to ensure. The vesting of all executive power in an accountable government official was just as much a part of Article II's design as the vesting of that power in one individual. Under this structure, private, unaccountable plaintiffs may not seek public remedies, which is exactly what Plaintiffs attempt here by suing for civil penalties payable to the U.S. Treasury to the tune of over $68,000 per day, per violation.

Because Plaintiffs wield executive power, their lawsuit triggers the private nondelegation doctrine, which prevents private individuals from wielding government power and limits their role to giving advice, assistance, and recommendations to an agency with authority and surveillance over them. Plaintiffs cannot meet this test, and their citizen suit violates this doctrine. And because Congress has allowed Plaintiffs to wield executive power to bring a lawsuit that the Executive declined to pursue, Congress has interfered with the President's ability to employ prosecutorial discretion and thereby violated the Executive Vesting and Take Care Clauses. Finally, because Plaintiffs exercise significant governmental authority on a continuing basis, this lawsuit violates the Appointments Clause. For all of these reasons, the Court should dismiss the Complaint.

**STATEMENT OF FACTS & PROCEDURAL HISTORY**

Amsted Graphite Materials LLC ("Amsted" or "Defendant") "owns and operates a facility . . . in Anmoore, West Virginia" that "produces specialty carbon and graphite products." *See* Complaint ("Compl.") ¶¶ 7–8. The facility operates under "West Virginia/National Pollutant

2

Discharge Elimination System ('WV/NPDES') Permit WV0004707," which allows it to discharge, subject to discharge limitations, "industrial wastewater . . . and storm water runoff . . . into Anmoore Run and . . . into an unnamed tributary of Anmoore Run approximately 2 miles from its confluence with Elk Creek, a tributary of the West Fork River, a tributary of the Monongahela River." *Id.* ¶¶ 2, 24. The facility also discharges groundwater into Anmoore Run. *Id.* ¶ 24.

Amsted became responsible for the WV/NPDES Permit on July 6, 2020, after acquiring an ownership in the facility in June 2020. *See* Consent Order, Findings of Fact ¶ 1, attached as **Exhibit A**.[1] The WV/NPDES Permit was renewed on April 28, 2021. *Id.*; *see also* Compl. ¶ 25; Consent Agreement and Final Order ("CAFO") ¶ 26, attached as **Exhibit B**.[2] On March 8, 2022, and after the required public comment period, the CAFO entered between Amsted and EPA was filed. Ex. B, p. 1. As part of the binding agreement, Amsted agreed to pay a civil penalty of $216,436. *Id.* ¶¶ 78–87.

"Section I.B. of [WV/NPDES Permit WV0004707] contains a compliance schedule that required Amsted to complete the construction of any necessary upgrades and achieve the final effluent limitations for several types of [alleged pollutants] by June 1, 2023." Compl. ¶ 26. The West Virginia Environmental Quality Board twice extended the compliance deadlines in July 2023

---

[1] The Complaint cites to the Consent Order Amsted entered with the West Virginia Department of Environmental Protection ("WVDEP"). Compl. ¶ 28. The Consent Order was signed on January 24, 2024, and became effective on March 13, 2024, after the expiration of the required public comment period. It is specifically referenced to in the Complaint and integral to Plaintiffs' claims and can be considered by this Court. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

[2] The CAFO is a consent order between Amsted and EPA and is subject to judicial notice. *See, e.g.*, *S. River Watershed All., Inc. v. DeKalb Cnty.*, 484 F. Supp. 3d 1353, 1365 (N.D. Ga. 2020), *aff'd*, 69 F.4th 809 (11th Cir. 2023); *Wai Ola All. v. U.S. Dep't of the Navy*, 734 F. Supp. 3d 1034, 1044 (D. Haw. 2024); *Maroney v. Woodstream Corp.*, 695 F. Supp. 3d 448, 453–54 (S.D.N.Y. 2023); *Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1159 (E.D. Wash. 2013).

and March 2024. *Id.* ¶ 27. "WVDEP issued interim limits in an administrative consent order, effective on January 24, 2024, that took the place of final average limits for some parameters . . . until April 30, 2024 . . . ." *Id.* ¶ 28. In signing the Consent Order, Amsted agreed to a civil penalty of $268,655 for past violations of the WV/NPDES Permit and to stipulated penalties of $2,000 per day for any failure to reach any agreed milestones. Ex. A, p. 7. Amsted unequivocally waived its rights to both appeal the Consent Order and to challenge WVDEP's jurisdiction. *Id.*, p. 8.[3]

On December 23, 2025, Plaintiffs sent a Notice of Intent to Sue Letter to Amsted, the EPA Administrator, and WVDEP threatening to sue and alleging Amsted was violating the CWA by violating its WV/NPDES Permit and the WVDEP 2024 interim limits. Compl. ¶ 4. Plaintiffs allege that some of their "members use, enjoy, and benefit from . . . [the] unnamed tributary to Anmoore Run and Anmoore Run, and indirectly into the downstream waters, including Elk Creek, the West Fork River and the Mono[n]gahela River. Their recreational interests include wading, fishing, swimming, and generally enjoying the waters of those streams." *Id.* ¶ 12. "Plaintiffs' members, including Christa Clasgens and Nathan Rees, recreate in areas downstream from the" facility. *Id.* ¶ 13. Clasgens and Rees have "professional guide services for clients fishing in those waters," and "the members enjoy their visits to the affected waters less" due to the alleged discharges. *Id.*

EPA did not initiate a CWA lawsuit against Defendant prior to April 23, 2026. *See id.* ¶ 5. Although "WVDEP issued interim limits in an administrative consent order, effective on January 24, 2024," it too did not initiate a CWA lawsuit against Defendant prior to Aprily 23, 2026. *Id.* ¶¶ 5, 28. On that date, Plaintiffs filed their CWA Complaint under 33 U.S.C. § 1365(a), alleging

---

[3] On July 31, 2025, WVDEP issued a stipulated penalty assessment for $390,000 pursuant to the terms of the Consent Order. In total, between the Consent Order and the CAFO, Amsted has been assessed and agreed to pay $875,091. These facts are not necessary for this Court's consideration of the arguments set forth in this Motion and are presented merely to provide proper context.

Defendant violated its WV/NPDES Permit discharge limits and the WVDEP 2024 interim limits. *Id.* ¶¶ 34–39. Plaintiffs pray for declaratory and injunctive relief, request that this Court assess a $68,445 penalty "per day for each violation" against Defendant, and seek attorney's and expert witness fees. *Id.* ¶¶ 22–23 & Requests for Relief.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss should be granted where the complaint lacks "factual allegation[s] sufficient to plausibly suggest" a claim's elements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–83 (2009). An argument attacking the constitutionality of a statute may be made through a motion to dismiss. *See United States v. Morrison*, 529 U.S. 598, 604 (2000).

**LEGAL ARGUMENT – 33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS**

**I.      Plaintiffs Are Exercising the Executive Power**

Through § 1365, Congress has unconstitutionally vested executive power in private citizens by allowing them to seek civil penalties payable to the U.S. Treasury for alleged violations of the statute. The Framers vested "the 'executive Power'—all of it—. . . 'in a President,'" and the pursuit of "daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 219 (2020) (citation omitted); *see also Trump v. Slaughter*, 146 S. Ct. 2283, 2305 & n.4 (2026); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). Because Plaintiffs seek civil penalties payable to the U.S. Treasury of over $68,000 per day, per violation, they exercise executive power. *See* Compl. ¶ 23; *see also* Baron de Montesquieu, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6, p. 157 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ("the executive power" includes the power by which the magistrate "punishes"), attached as **Exhibit C**; John Locke, *Second Treatise on Government* §§ 7,

5

13, pp. 9, 12 (East India Publishing Co. ed. 2023) (1689) ("the executive power" includes the "right to punish the transgressors"), attached as **Exhibit E**.[4]

Further, Plaintiffs exercise executive power by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976); *see also Slaughter*, 146 S. Ct. 2305 ("[T]he 'discretionary power to seek judicial relief' lies at the very core of executive authority." (quoting *id.* at 138)). There is a "longstanding distinction between injured parties seeking reparation for private harms and suits by sovereigns that 'seek to redress a wrong to the public as a whole, not just a wrong to the individual.'" *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1313 (M.D. Fla. 2024) (quoting *Trump v. United States*, 603 U.S. 593, 614 (2024)). This distinction is rooted in "the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs,'" *Huntington v. Attrill*, 146 U.S. 657, 668–69 (1892) (quoting 3 William Blackstone, *Commentaries on the Laws of England* *2), and "[r]ights were typically divided into private rights and public rights." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 548 (2020) (Thomas, J., concurring).

"'[P]ublic rights'" are those "that involve duties owed 'to the whole community, considered as a community, in its social aggregate capacity.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (quoting 4 Blackstone, Commentaries *5); *see also Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune v. Wofsy*, 838 F.3d 992, 1001 (9th Cir. 2016) (citation omitted). Public rights "include interests generally shared, such as . . . general

---

[4] Because *Seila Law* already settled this issue, based on this precedent alone, this Court can hold that Plaintiffs' pursuit of civil penalties is an exercise of the executive power. Besides the argument from precedent, this Court can conduct an originalist analysis. *See United States v. Rahimi*, 602 U.S. 680, 708–10 (2024) (Gorsuch, J., concurring); *id.* at 715, 722 n.3, 723 (Kavanaugh, J., concurring); *id.* at 737–39 (Barrett, J., concurring). Such an analysis of "the executive power" would point to the same conclusion. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring).

compliance with regulatory law." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004) (footnote and citation omitted). A public wrong could be pursued only "at the suit of the king" for public remedies such as "fine and imprisonment." 4 Blackstone, *supra*, at \*6, attached as **Exhibit D**.[5] In contrast, private rights are those "'belonging to individuals, considered as individuals.'" *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (quoting 3 Blackstone, *supra*, at \*2); *see also Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune*, 838 F.3d at 1001 (citation omitted). Such rights an individual can redress only by pursuing private remedies, which would "either restor[e] to him his right, if possible" (*i.e.*, have taken property returned), "or by giving him an equivalent" of "private compensation" through "civil satisfaction in damages." 4 Blackstone, *supra*, at \*6–7; *see* Locke, *supra*, § 10, p. 10 ("a particular right to seek reparation from him that has done it").

Citizen suit plaintiffs sue to vindicate public rights because "'there is only one claim—the public's claim,'" *Alliance v. Crown Res. Corp.*, No. 2:20-cv-147, 2025 WL 394952, at \*2 (E.D. Wash. Feb. 4, 2025) (citation omitted), and "citizen plaintiffs effectively stand in the shoes of the EPA." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (Citizen plaintiffs "seek relief not on their own behalf but on behalf of society as a whole[.]" (citation omitted)). Plaintiffs are suing to redress alleged wrongs to public rights because they allege harms to the "waters of the United States." Compl. ¶ 2. Indeed, they admit that the only time the CWA applies is when the "waters of the United States" are implicated. *Id.* ¶ 15. There are alleged harms to five "waters," *id.* ¶ 24, none of which Plaintiffs allege an ownership interest in, as the only alleged "environmental, aesthetic, and

---

[5] Because the Montesquieu, Locke, and Blackstone sources are not readily available on a legal search engine, Defendant has provided them as exhibits to this Motion for the Court's convenience.

recreational interests" are those the whole community shares. *Id.* ¶¶ 12–13. Thus, Plaintiffs seek to "[v]indicat[e] 'the *public* interest'" which "is the function of Congress and the Chief Executive.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation omitted); *see* 4 Blackstone, *supra*, at *2 (The sovereign was "the person injured by every infraction of the public rights belonging to that community, and is therefore in all cases the proper prosecutor for every public offence."); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 789 (The Framers understood the President to be the "avenger of public wrongs."). Vindicating the public interest is not the function of private individuals, but Plaintiffs attempt to do so here.

## II.    Plaintiffs' Exercise of Executive Power Violates the Private Nondelegation Doctrine

Congress's vesting of executive power in private plaintiffs, and Plaintiffs' attempt to wield it here, run afoul of the private nondelegation doctrine. *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) ("[A] nondelegation principle serves . . . to retain power in the governmental Departments so that delegation does not frustrate the constitutional design.").[6] This doctrine teaches that the Constitution's separation of powers forbids Congress from enacting a law that "allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025). In contrast, laws are permissible under which "private actors" provide only "advice and assistance" to "[g]overnment agencies" and "give [them] recommendations." *Id.* at 692; *see also*

---

[6] *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("There is not even a fig leaf of constitutional justification" for allowing "private entities" to exercise "'executive Power,'" as "it raises '[d]ifficult and fundamental questions' about 'the delegation of Executive power' when Congress authorizes citizen suits." (alteration in original) (citation omitted)); *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) ("[T]he Vesting Clauses . . . bar unchecked reassignments of power to a non-federal entity."); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("*Black I*") (The "Constitution permits only the federal government to exercise federal power."); Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 352 (2002).

*Pittston*, 368 F.3d at 395 ("Congress may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others."). A government agency must "retain[] decision-making power" so that "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 692, 695 (citation omitted). Further, private actors must "'function[] subordinately to' the agency" and be "subject to [the agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted).[7] Section 1365 violates this doctrine by allowing citizen plaintiffs to govern.

Section 1365 lets citizen plaintiffs govern by allowing them to exercise executive power. *See supra* pp. 5–8. Here, Plaintiffs exercised that power by filing their Complaint without the Government's "say-so." *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). This violates the private nondelegation doctrine. Plaintiffs did not advise the Government that the Government should file this complaint. Plaintiffs did not give the Government assistance in filing this complaint. And Plaintiffs did not recommend that the Government file this complaint. *Id.* at 692. Instead, Plaintiffs governed by making this filing without the Government's "say-so." *Id.* at 695. Thus, one cannot say that the Government "alone has decision-making authority." *Id.* at 693.

Further, Plaintiffs do not "'function[] subordinately to' [any] agency" because they are not "subject to [any agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). To determine what authority the Executive Branch has over Plaintiffs, the proper place to look is the pertinent

---

[7] "This commonsense principle" "is reflected in the Supreme Court's non-delegation cases," in which the Court "has set its face against giving public power to private bodies." *Black I*, 53 F.4th at 880. For example, in "the leading case" on the private nondelegation doctrine, *Carter Coal* held the Bituminous Coal Conservation Act of 1935 authorizing local coal district boards to adopt codes setting minimum coal prices to be unconstitutional. *Consumers' Rsch.*, 606 U.S. at 692. This was because the Act was "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

9

statute, as an "agency 'literally has no power to act unless and until authorized by statute.'" *FCC v. AT&T, Inc.*, 146 S. Ct. 1418, 1428 (2026) (citation omitted) (cleaned up). The CWA gives the Executive Branch essentially no authority over Plaintiffs. The only post-suit rights any officials have is that "the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator," and, if the private plaintiff wants to settle with the defendant, the Attorney General and Administrator are entitled to only a 45-day review period. 33 U.S.C. § 1365(c)(3). The officials lack final decision-making authority over the proposed consent judgment. This scheme inverts the way the public and private entities are supposed to interact. To survive private nondelegation doctrine scrutiny, "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). If the private plaintiff wants to settle, however, the Government can only make recommendations, with the private plaintiff retaining the final say.

Although the Administrator "may intervene as a matter of right," 33 U.S.C. § 1365(c)(2), this limited intervention right does not expressly give the Executive Branch the ability to dismiss a citizen suit over a private plaintiff's objection. It can be contrasted with the right Congress gave in the False Claims Act ("FCA") *qui tam* statute, another law that allows private plaintiffs (known as relators) to exercise executive power. 31 U.S.C. § 3730(b)(2), (c)(2)(A), (c)(3). That statute expressly gives the Government the ability to intervene and dismiss a *qui tam* action at any time over the relator's objection.[8] *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S.

---

[8] In this way, the constitutionality of § 1365 is even more suspect than the FCA *qui tam* statute. *Polansky*, 599 U.S. at 442 (Kavanaugh, J., joined by Barrett, J., concurring) (stating "'[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'" (citation omitted)); *id.* at 449 (Thomas, J., dissenting) (same).

419, 424 (2023).[9] The Executive Branch "is given no statutory authority to approve, review, or countermand any of [Plaintiffs' litigation] decisions. All of that enforcement, according to [CWA]'s 'plain terms,' 'can be done by the private entities without the [Executive Branch]'s involvement.'" *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 178 F.4th 224, 247 (5th Cir. 2026) ("*Black III*") (citations omitted).

The CWA's "diligent prosecution bar" does not remedy the statute's constitutional defects. That bar prevents a citizen plaintiff from suing "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State." 33 U.S.C. § 1365(b)(1)(B). But critically, the EPA Administrator has only "sixty days" to exercise this authority "after the plaintiff has given [the Administrator] notice." *Id.* § 1365(b)(1)(A). If the Government does not sue within sixty days (as happened here), then the citizen plaintiff may file its complaint without the Government's say-so. Thus, Plaintiffs do not "*remain*[] 'subject to [the agency's] pervasive surveillance and authority' when it matters." *Oklahoma*, 163 F.4th at 314

---

[9] Although § 1365(c)(2) does not expressly allow Executive Branch officials to dismiss a citizen suit over a private plaintiff's objections, one could argue that the President's inherent authority to remove those exercising executive power gives him the ability to dismiss citizen suits. *See generally Slaughter*, 146 S. Ct. 2283. If this is correct, and assuming, *arguendo*, that this gives the Executive Branch "authority and surveillance" over citizen plaintiffs such that they are "subordinate," this does not cure the private nondelegation violation for two reasons. First, subordination is necessary, not sufficient. An agency needs to have authority, *and* it needs to exercise that authority such that nothing the citizen plaintiffs do has any "legal (or, indeed, practical) effect [until] the [agency] decides they should." *Consumers' Rsch.*, 606 U.S. at 694; *Black III*, 178 F.4th at 247 (same). Second, authority to intervene and dismiss amounts to "some back-end review over [Plaintiffs'] enforcement actions," which is not enough to survive private nondelegation doctrine scrutiny. *Black III*, 178 F.4th at 247. Back-end review would be "too little too late." *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1326 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025) (preliminarily enjoining Financial Industry Regulatory Authority ("FINRA") from expelling a member prior to review by the Securities and Exchange Commission ("SEC") because "SEC review can come only after, not before, the expulsion [from FINRA] takes effect").

(alteration in original) (emphasis added) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)).

Even opinions finding no private nondelegation doctrine violation serve to underscore how far citizen suits are from satisfying this doctrine. The *Consumers' Research* Court upheld a delegation from the Federal Communications Commission ("FCC") to the private Universal Service Administrative Company, which serves as Administrator for the Universal Service Fund. Whereas "the Administrator is broadly subordinate to the" FCC because the "FCC appoints the Administrator's Board of Directors and approves its budget," here, Plaintiffs self-appoint and approve their own case budget. *Consumers' Rsch.*, 606 U.S. at 692–93 (citation omitted). Further, the "Administrator makes the initial projections" and "estimates the programs' cost," which the FCC reviews "and either revises or approves." *Id.* at 693–94. Thus, the FCC was the entity making the final decision. In contrast, citizen plaintiffs do not recommend how CWA suits should proceed and instead litigate cases independent of EPA's surveillance. "In every way that matters to the constitutional inquiry, [Plaintiffs], not the [EPA], [are] in control." *Id.* at 695.

In an opinion that predates, but is consistent with, *Consumers' Research*, the Fourth Circuit rejected a private nondelegation challenge to the Coal Industry Retiree Health Benefits Act of 1992. *Pittston*, 368 F.3d at 393–98. That statute created the private United Mine Workers of America Combined Benefit Fund ("Combined Fund") "to provide benefits to retired coal miners." *Id.* at 391, 395. It is distinguishable because it gave the "Social Security Commissioner, rather than the Combined Fund," governmental powers. *Id.* at 395; *see id.* at 396 (the statute reserved to "the Commissioner . . . core governmental powers"). The limited "powers given to the Trustees [of the Combined Fund] are of an administrative or advisory nature" and the Combined Fund "merely carr[ies] out the ministerial task of doing calculations and collecting funds." *Id.* at 396–97.

12

And although the Sixth Circuit split with the Fifth and rejected a facial nondelegation challenge to the Horseracing Integrity and Safety Act ("HISA"), it did so because HISA gives the Federal Trade Commission ("FTC") "'pervasive' oversight and control of the [Horseracing Integrity and Safety] Authority's enforcement activities[.]" *Oklahoma*, 163 F.4th at 312. For example, whenever the Authority proposes a sanction, an "aggrieved entity may obtain review from an Administrative Law Judge," and "[a]fter that, the FTC has full authority to review . . . [and] reverse any sanction by the Authority." *Id.* at 311 (citations omitted). Further, the "Authority's adjudication decisions do not become final until the FTC has the opportunity to review them," and if "the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction." *Id.* (citations omitted). Also, HISA empowers the FTC to promulgate "rules constraining the Authority's investigations and increasing the procedural rights" and "to determine *who* the Authority investigates." *Id.* at 312. Indeed, at the time *Oklahoma* was decided, there was a proposed "rule that would require the FTC's approval before the Authority may issue a subpoena or bring a civil enforcement action." *Id.* (citation omitted). There is nothing remotely similar here. Thus, even if this Court finds that *Oklahoma* is more persuasive than *Black III* (or if the Supreme Court resolves the split in the Sixth Circuit's favor), this Court should still dismiss Plaintiffs' Complaint.

Enforcing the private nondelegation doctrine to dismiss Plaintiffs' Complaint also would further the rationale behind vesting the executive power in the sovereign alone. The Framers took the "sword out of private hands and turn[ed] it over to an organized government, acting on behalf of all the people." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282–83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari); *see also* 4 Blackstone, *supra*, at *7–8 ("In a state of society this right is transferred from individuals to the sovereign power."); Locke, *supra*,

13

§§ 88–89, pp. 55–56 ("every man who has entered into civil society . . . has thereby quitted his power to punish offences" and has "quit . . . his executive power"). This was done to prevent self-interested, private individuals from using "the power of human punishment" for their own ends. 4 Blackstone, *supra*, at *7–8; *see Carter Coal*, 298 U.S. at 311 (delegation to "private persons" was unconstitutional because they were not "disinterested"); Locke, *supra*, § 90, p. 56 ("[C]ivil society [sought] to avoid, and remedy those inconveniences of the state of nature, which necessarily follow from every man's being judge in his own case, by setting up a known authority, to which every one of that society may appeal upon any injury received, or controversy that may arise[.]"). With § 1365, Congress undid the Framers' design and placed the sword in private hands.

Further, this diffusion of executive power, and the vesting of it in citizen plaintiffs who are not accountable to the President, impairs the liberty and accountability the separation of powers was meant to secure. *Oklahoma*, 163 F.4th at 305 ("Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn."); *see also Ass'n of Am. R.R.s*, 575 U.S. at 57 (Alito, J., concurring); *Black I*, 53 F.4th at 880; Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339, 391 (1990). Plaintiffs do not merely give advice, assistance, and recommendations to EPA, they do not function subordinately to EPA, and they are not subject to EPA's authority and surveillance such that EPA retains decision-making power. *Consumers' Rsch.*, 606 U.S. at 692; *see also Alpine*, 121 F.4th at 1325; *Black I*, 53 F.4th at 889–90. For these reasons,[10] and because "'quintessentially executive' power may not be cleaved off from the

---

[10] Congress exacerbated the private delegation violation because § 1365 "also forecloses certain indirect methods of Presidential control" by allowing Plaintiffs "receipt of funds outside the appropriations process." *Seila Law*, 591 U.S. at 225–26. "The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies." *Id.* at 226 (citations omitted). Although "Presidents frequently use these budgetary tools

14

Executive Branch," *Slaughter*, 146 S. Ct. at 2305, the citizen suit provision and Plaintiffs' lawsuit violate the private nondelegation doctrine.

**III.    CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion**

Congress's vesting of executive power in private plaintiffs impairs the President's ability to employ prosecutorial discretion, which is a core executive power. *United States v. Texas*, 599 U.S. 670, 684 (2023); *id.* at 689 (Gorsuch, J., concurring in judgment). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The Framers imbedded this concept in Article II because they took to heart "Montesquieu's maxim" that, "[i]f the executive and legislative powers were united, the wielder of both powers would enact tyrannical laws and execute them tyrannically." Prakash, *supra*, at 798 (footnotes omitted). With "the executive Power" separated, however, "the executive could temper the effects of tyrannical laws with mild execution." *Id.* at 781 (footnote omitted); *see also* Locke, *supra*, § 11, p. 10–11 ("the magistrate . . . can often, where the public good demands not the execution of the law, remit the punishment of criminal offences by his own authority").

The power of prosecutorial discretion extends to "an agency's decision not to prosecute or enforce, whether through civil or criminal process, [and] is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). This is because "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision

---

'to influence the policies of independent agencies,'" "no similar opportunity exists for the President to influence" plaintiffs' pursuit of citizen suits. *Id.* (citation omitted). For example, if EPA or DOJ exercises discretion contrary to his wishes, the President can limit their funding through a budget bill veto. Plaintiffs, however, are immune from this pressure, as they self-fund.

15

of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832 (citation omitted); *see also Buckley*, 424 U.S. at 139. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants . . . falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Through CWA citizen suits, however, private plaintiffs (and their attorneys) vitiate prosecutorial discretion by choosing how to prioritize and how aggressively to pursue CWA actions against defendants. Indeed, the only time citizen suit plaintiffs can sue is when, after a 60-day waiting period, the Executive Branch does not prosecute the alleged CWA violation. *See* 33 U.S.C. § 1365(b)(l)(A). To be sure, the President may head off the citizen suit by having the Administrator commence a lawsuit, *see id.* § 1365(b)(1)(B), but this impinges on the President's power of prosecutorial discretion by forcing him to do the very thing he does not want done. *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting).

*Trump v. United States* confirms that Congress may not second-guess the Executive Branch's enforcement decisions. The Court there reiterated that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and this authority finds its source in the Take Care Clause. 603 U.S. at 620 (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting); *see also Slaughter*, 146 S. Ct. at 2307. The CWA's citizen suit provision, however, allows Congress to

16

avoid this prohibition by empowering private citizens to bring the very claims that the President decided not to pursue. Thus, "'by concentrating power in a unilateral actor insulated from Presidential control,'" Congress breaks the executive chain of command by allowing unaccountable private parties to bring lawsuits that the Executive Branch has chosen not to pursue. *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (citation omitted).

Moreover, by requiring this Court "to enforce" the very "effluent standard or limitation" that the President has declined to enforce, *see* 33 U.S.C. § 1365(a), Congress exacerbates the Take Care violation by "transfer[ring] from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). The Supreme Court has "always rejected" such a "vision of [its] role" that "would enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *Id.* (citations omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("But federal courts do not exercise general oversight of the Executive Branch . . . ."). It has also recognized a distinction between "a mere ministerial duty, the performance of which might be judicially enforced," and a duty that is "purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 498–99 (1866) (A ministerial duty "is one in respect to which nothing is left to discretion."). There are "general principles which forbid judicial interference with the exercise of Executive discretion," as any attempt by the Judiciary to control discretionary duties "might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* at 499. This is exactly what Congress forces the Judiciary to do through § 1365.

This subjects citizen suit defendants to a loss of "liberty as described by Locke"; liberty understood as "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another

man.'" *Ass'n of Am. R.R.s*, 575 U.S. at 75–76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J. Gough ed. 1947)); *see also Seila Law*, 591 U.S. at 223–24. Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J., concurring). But because CWA citizen suits prevent the proper operation of Article II, any private plaintiff who disagrees with EPA's decision not to sue can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gave the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President and his Executive Branch subordinates' power to decline to bring lawsuits. *Texas*, 599 U.S. at 678; *Heckler*, 470 U.S. at 831–32. Congress undermined that prerogative with CWA citizen suits.[11]

## IV.    Congress Violated the Appointments Clause

By creating CWA citizen suits, Congress violated the separation of powers by allowing private citizens to exercise significant governmental authority contrary to the Appointments Clause. The Clause by default requires the President to nominate and the Senate to confirm all "Officers of the United States," while allowing an exception for "inferior Officers" whose appointment Congress has "by Law vest[ed] . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. This arrangement "prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to

---

[11] Defendant acknowledges that multiple district courts have rejected constitutional arguments against CWA citizen suits. *See, e.g.*, *Patterson v. Barden & Robeson Corp.*, No. 04-cv-803, 2007 WL 542016, at *8 (W.D.N.Y. Feb. 16, 2007); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555–56 (E.D.N.C. 2001); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623–26 (D. Md. 1987); *Student Pub. Interest Rsch. Grp. of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985). But none of these non-binding opinions involved a private nondelegation doctrine argument, much less Defendant's history and text-based arguments. Moreover, they lacked the benefit of the Supreme Court's recent opinions.

appoint." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991). An individual is an "officer" requiring appointment under the Appointments Clause when he (1) "'exercise[s] significant authority pursuant to the laws of the United States'"; and (2) "occup[ies] a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citations omitted).[12]

The first prong's requirements are established by the prior sections on the Executive Vesting and Take Care Clauses, and this argument need not be repeated here in full. It suffices to say that Plaintiffs exercise "significant authority" by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley*, 424 U.S. at 140. Further, Plaintiffs exercise "significant authority" by pursuing "daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power." *Seila Law*, 591 U.S. at 219. Courts also consider "significant authority" to exist when an actor "'exercise[s] significant discretion,'" *Lucia*, 585 U.S. at 245, 247–48 (citation omitted), which occurs here because Plaintiffs "possess[] authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678 (citations omitted). And, unlike those who are non-officers, Plaintiffs do not operate in an "advisory" role and make "only non-binding recommendations." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). Thus, the first prong is met.

The second prong also is met because Plaintiffs "occupy a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (citation omitted). This prong "[s]tress[es] 'ideas of tenure [and] duration'" and asks whether the putative officer's statutory duties are "'occasional or temporary'

---

[12] There is debate over whether the Appointments Clause applies to individuals/entities who are not part of the government and whether challenges to non-governmental individuals/entities should be through the private nondelegation doctrine instead. *Black III*, 178 F.4th at 249–53. Defendant makes this argument in the alternative to its private nondelegation argument, and the Court need not address the Appointments Clause argument if it dismisses on private nondelegation grounds.

rather than 'continuing and permanent.'" *Id.* (citation omitted). This inquiry "embraces the ideas of tenure, duration, emolument, and duties" as set out in the relevant statute. *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511 (1878); *see also Zafirov*, 751 F. Supp. 3d at 1313 ("the 'continuing position' inquiry focuses on an individual's statutory duties, powers, and emoluments"). Here, this test is met because the statute identifies the office's duties, including that the citizen plaintiff must give sixty days' notice "of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]" 33 U.S.C. § 1365(b)(1)(A). The office includes the powers to "commence a civil action . . . against any person . . . alleged to be in violation" and seek "any appropriate civil penalties." *Id.* § 1365(a). Further, "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action," the citizen plaintiff "may intervene as a matter of right." *Id.* § 1365(b)(1)(B). Finally, § 1365(d) gives "any prevailing or substantially prevailing" citizen plaintiff an emolument of "costs of litigation."[13]

The notion that Plaintiffs "occupy a continuing position" is bolstered by the fact that, since 2007, they have filed seventeen CWA citizen suits in the Northern[14] and Southern[15] Districts of

---

[13] This Court can hold that Plaintiffs occupy a continuing position even if not all factors of the *Lucia* "continuing position" test are met. For example, the Supreme Court recently held that members of the Preventative Services Task Force are officers even though "[t]hey serve on a volunteer basis" and "are not paid by the Federal Government." *Braidwood*, 606 U.S. at 755.

[14] *W.V. Highlands Conservancy v. Dana Mining Co.*, No. 1:19-cv-149; *W.V. Highlands Conservancy v. Brooks Run Mining Co.*, No. 2:19-cv-41; *W.V. Highlands Conservancy v. Huffman*, No. 1:16-cv-70; *W.V. Rivers Coal. v. Ohio Power Co.*, No. 5:14-cv-103; *W.V. Highlands Conservancy v. Coresco, LLC*, No. 1:12-cv-25; *W.V. Highlands Conservancy v. Monongahela Power Co.*, No. 1:11-cv-71; *W.V. Highlands Conservancy, Inc. v. Huffman*, No. 1:11-cv-118; *W.V. Highlands Conservancy, Inc. v. Timmermeyer*, No. 1:07-cv-87.

[15] *W.V. Rivers Coal., Inc. v. The Chemours Co. FC, LLC*, No. 2:24-cv-701; *W.V. Highlands Conservancy v. Se. Land, LLC*, No. 3:18-cv-77; *W.V. Highlands Conservancy v. Se. Land, LLC*, No. 2:17-cv-3013; *W.V. Highlands Conservancy v. Huffman*, No. 2:16-cv-3769; *W.V. Highlands Conservancy v. Fola Coal Co.*, No. 2:15-cv-1371; *W.V. Rivers Coal. v. Appalachian Power Co.*,

West Virginia. Essentially, they "act[] as a self-appointed mini-EPA." *See Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting). If multiple courts have held that an individual who temporarily pursues a single case can be an officer, *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (special prosecutors appointed by district courts); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) (special counsel); *In re Sealed Case*, 829 F.2d 50, 56–57 (D.C. Cir. 1987) (independent counsel), then litigants like Plaintiffs which regularly file enforcement actions over a nineteen-year period qualify as officers. Further, the office of citizen suit plaintiff is not personal to Plaintiffs, which is underscored here by the fact that there are two Plaintiffs; if one withdrew, the other could still pursue the suit. Further, Plaintiffs are nonprofit corporations; if they were to withdraw, the suit still could be prosecuted by one or more of their members. *See* Compl. ¶¶ 10–13. Thus, the office's "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.).

Because Plaintiffs "possess[] all the traditional indicia of holding a constitutional 'office,'" and this "position is analogous to other temporary officials wielding core executive power whom courts have categorized as officers," Plaintiffs "occup[y] a 'continuing position'" and "thus satisf[y] step two of the test for officer status." *Zafirov*, 751 F. Supp. 3d at 1317. But they have not been appointed to their office consistent with the Appointments Clause, nor does the CWA require that they be so appointed. Therefore, § 1365 violates the Appointments Clause.

---

No. 3:14-cv-24237; *W.V. Highlands Conservancy, Inc. v. Huffman*, No. 2:11-cv-524; *W.V. Highlands Conservancy, Inc. v. Huffman*, No. 2:07-cv-410.

## V.      CWA Citizen Suits Have No Basis in History or Tradition

Besides examining Article II's clauses to determine whether Congress violated the separation of powers, the Supreme Court considers as relevant whether a statute lacks a historical precedent. According to this criterion, courts considering separation-of-powers challenges should view Congressional enactments with skepticism when they are "an innovation with no foothold in history or tradition." *Seila Law*, 591 U.S. at 222. "'Perhaps the most telling indication of the severe constitutional problem with [a statute] is the lack of historical precedent for'" it. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (citation omitted). Citizen suits have no foothold in history or tradition because, "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs . . . . The situation has changed markedly, especially over the last 50 years or so." *TransUnion*, 594 U.S. at 428 n.1. Their status as "a historical anomaly" provides additional evidence as to why there are constitutional violations here. *Seila Law*, 591 U.S. at 220, 222 ("CFPB's single-Director structure" was unconstitutional because it was "almost wholly unprecedented"); *see United States v. Arthrex*, 594 U.S. 1, 21 (2021).[16]

Far from there being a tradition of private citizens exercising executive power, there has been since the Founding a tradition of the Executive pursuing public remedies to vindicate public rights and having discretion over such suits. *See supra* pp. 5–8, 15–18. This tradition was confirmed by the Supreme Court in the nineteenth century. *Martin v. Hunter's Lessee*, 14 U.S. 304, 329–30 (1816) ("The second article declares that 'the executive power *shall be vested* in a president of the United States of America.' Could congress vest it in any other person . . . ? It is apparent that such a construction . . . would be utterly inadmissible."); *Confiscation Cases*, 74 U.S. 454, 457 (1868) (noting the "[s]ettled rule" that "civil or criminal" suits cannot proceed "for the

---

[16] The United States agrees "citizen suits lack the historic pedigree" needed for them to be upheld. *See NAACP v. x.AI*, No. 3:26-cv-74, ECF Doc. 86 at ECF p. 28 n.5 (N.D. Miss. Jul. 7, 2026).

benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business, in his absence, as may appertain to the duties of his office"). And it continued into the twentieth century, *Buckley*, 424 U.S. at 139; *Printz v. United States*, 521 U.S. 898, 922–24 (1997), and remains the law today. *All. for Hippocratic Med.*, 602 U.S. at 382; *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment).

Any contention that citizen suits are constitutional because, as *TransUnion* acknowledged, they have been included in federal statutes over the last fifty-five years, must be rejected. A court's "inquiry is sharpened rather than blunted by the fact that Congressional [enactments] are appearing with increasing frequency in statutes which delegate authority to" private plaintiffs to wield executive power. *INS v. Chadha*, 462 U.S. 919, 944 (1983); *see also Slaughter*, 146 S. Ct. at 2309; *Seila Law*, 591 U.S. at 231–32. Indeed, due to the nature of Congress's constitutional powers, it shouldn't be surprising that it can take more than a half-century for novel Congressional enactments to be found unconstitutional. Because Congress's powers are "'at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'" *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273–74 (1991) (citation omitted). Congress has encroached on the Executive Branch by creating CWA citizen suits, which have no "foothold in history or tradition," a consideration that points to a separation of powers violation.

## CONCLUSION

Although the Constitution envisions checks against the excessive application of executive power, CWA citizen suits eviscerate these checks by violating numerous constitutional provisions. Any role private plaintiffs may have in the enforcement of federal environmental law is

23

constitutionally limited to seeking private remedies for alleged private wrongs. But Congress did not structure the CWA that way. Instead, Plaintiffs' citizen suit is an exercise of Article II's executive power, which Plaintiffs have no right to wield. If Congress believes under-enforcement of the CWA to be a problem, "other forums remain open for examining the Executive Branch's" purported lack of diligence. *Texas*, 599 U.S. at 685. "For example, Congress possesses an array of tools to analyze and influence those policies—oversight, appropriations, the legislative process, and Senate confirmations, to name a few. And through elections, American voters can both influence Executive Branch policies and hold elected officials to account for enforcement decisions." *Id.* (citation omitted); *cf. Nat'l Rep. Sen. Comm. v. FEC*, 146 S. Ct. 2404, 2422 (2026) ("But a purported lack of Government (Executive) enforcement of campaign finance restrictions is not an excuse for the Government (Congress and the Executive) to turn around and enact legislation that would broadly suppress speech and sweep aside the First Amendment."). Because CWA citizen suits violate the Constitution's Executive Vesting, Take Care, and Appointments Clauses, as well as the private nondelegation doctrine, the Court should grant the motion to dismiss.

DATED: August 5, 2026.

Respectfully submitted,

/s/ Peter Raupp
Peter Raupp, Esq. (WVSB #10546)
David M. Flannery (WVSB #1216)
Kathy G. Beckett (WVSB #4998)
Allyn G. Turner (WVSB #5561)
Steptoe & Johnson PLLC
Chase Tower, 17th Floor
Post Office Box 1588
Charleston, WV 25326-1588
Telephone: (304) 353-8000
Facsimile: (304) 353-8180
Peter.Raupp@Steptoe-Johnson.com

24

25

Dave.Flannery@Steptoe-Johnson.com
Kathy.Beckett@Steptoe-Johnson.com
Allyn.Turner@Steptoe-Johnson.com

And

Sean J. Radomski* (Pa. Bar # 319732)
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 1000
Arlington, VA 22201
(202) 888-6881
sradomski@pacificlegal.org

Damien M. Schiff* (Cal.. Bar #235101)
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111
dschiff@pacificlegal.org

*Pro Hac Vice Pending

Counsel for Amsted Graphite Materials
LLC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

WEST VIRGINIA RIVERS COALITION and
WEST VIRGINIA HIGHLANDS
CONSERVANCY,

     Plaintiffs,

v.

AMSTED GRAPHITE MATERIALS LLC,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 1:26-cv-00046

## CERTIFICATE OF SERVICE

     I hereby certify that on August 5, 2026, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which is understood to have sent notification of such filing electronically to all counsel of record.

*/s/ Peter Raupp*
*Attorney for Defendant*
