**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**AT CLARKSBURG**

**WEST VIRGINIA RIVERS COALITION and WEST VIRGINIA HIGHLANDS CONSERVANCY,**

**Plaintiffs,**

**v.** **Civil Action No. 1:26-cv-00046-TSK**

**AMSTED GRAPHITE MATERIALS LLC,**

**Defendant.**

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**MIKE BECHER (WVBN 10588)**
**AMANDA DEMMERLE (WVBN 13930)**
**APPALACHIAN MOUNTAIN ADVOCATES, INC.**
**P.O. Box 11571**
**Charleston, WV 25339**
**Telephone: (304) 382-4798**
**Email: mbecher@appalmad.org**
**ademmerle@appalmad.org**

**JAMES M. HECKER (*PRO HAC VICE*)**
**PUBLIC JUSTICE**
**1620 L Street NW, Suite 630**
**Washington, DC 20036**
**Telephone: (202) 797-8600**
**Email: jhecker@publicjustice.net**

***Counsel for Plaintiffs***

**Table of Contents**


Factual Background ....................................................................................................1

Argument ....................................................................................................................4

I. Citizen Plaintiffs under the CWA Are Enforcing a Private Right, Not Exercising Executive Power to Enforce Public Rights ....................................................4

A. Citizen Suits Are Private Actions to Enforce Private Rights ...............................5

B. Injunctions and Civil Penalties Redress Private Injuries .......................................9

II. Citizen Suits Do Not Violate Separation of Powers Principles Because the Executive Branch Does Not Have Exclusive Power to Enforce Federal Law and Recover Civil Penalties ....................................................................................................13

A. Citizen Suit Plaintiffs Have Less Authority than Independent Counsels, which the Supreme Court Found to be Constitutional in *Morrison v. Olson* ..........................................................................................................13

B. Citizen Suits Plaintiffs Have Less Authority than *Qui Tam* Plaintiffs and Courts Have Found *Qui Tam* Suits to be Constitutional ................................17

C. Historical Scholarship Demonstrates That Private Enforcement of Regulatory Law Was Commonplace in England, Colonial American, and the Early Republic ..........................................................................................19

III. Citizen Suits Do Not Violate the Private Nondelegation Doctrine ..................................21

IV. Citizen Suits Do Not Violate the Appointments Clause Because They Assert Private Rights and Supplement Government Enforcement.......................................................24

Conclusion ..................................................................................................................25

Since taking over a graphite production facility in Anmoore, West Virginia, Defendant Amsted Graphite Materials, LLC (Amsted) has committed thousands of violations of its Clean Water Act (CWA) permit. Instead of taking responsibility for it actions, Amsted seeks to overturn more than 50 years of environmental law and upend citizen enforcement schemes that were enacted by Congress in hundreds of statutes. In its motion to dismiss, Amsted argues that the citizen suit provision of the CWA, 33 U.S.C. § 1365, is unconstitutional. Amsted's motion rests on a fundamental mischaracterization of the nature of citizen suits. Citizen suits enforce private, not public, rights and are constitutional. Adoption of Amsted's arguments would have far reaching consequences. It would abrogate private rights of action in 382 subsections of the United States Code and reach not only environmental suits, but actions to enforce civil rights, anti-trust, and consumer protection. *See* Baronia, *Private Enforcement at the Founding and Article II*, 114 Cal. L. Rev. 131, 143 (2026). The Court should reject Amsted's efforts to upend these long-established private rights of action.

**Factual Background**

Amsted owns and operates a facility in Anmoore, West Virginia, that "produces specialty carbon and graphite products by forming 'green' carbonaceous shapes from raw materials consisting of petroleum coke and coal tar pitch." Complaint (Compl.) ¶¶ 7–8. The facility discharges "industrial wastewater . . . and storm water runoff . . . into Anmoore Run and . . . into an unnamed tributary of Anmoore Run approximately 2 miles from its confluence with Elk Creek, a tributary of the West Fork River, a tributary of the Monongahela River." *Id.* ¶¶ 2, 24. The facility also discharges groundwater into Anmoore Run. *Id.* ¶ 24.

Amsted's discharges from its facility are regulated under WV/NPDES Permit No. WV0004707, which became effective on April 28, 2021. *Id.* ¶ 25. Amsted became responsible for

the WV/NPDES Permit on July 6, 2020, after acquiring an ownership in the facility in June 2020. ECF No. 8 (Amsted Mem.) at 3. The permit required Amsted to complete the construction of any necessary upgrades and achieve compliance with some limits immediately and others by June 1, 2023. Compl. ¶ 26. The latter deadline was extended to April 30, 2024, but until then Amsted still had to comply with weaker interim limits. *Id.* ¶ 27–28. All final limits became effective on May 1, 2024. Since November 2023, Amsted has violated its interim and final permit limits 1,130 times. *Id.* ¶¶ 29–32 & App. A.

Amsted's permit violations involve excessive discharges of toxic pollutants including lead, copper, zinc, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(a,h)anthracene, and indeno(1,2,3-cd)pyrene. *Id.* ¶¶ 32–33; 40 C.F.R. § 401.15(22), (44), (55), (65). WVDEP designated the permit limits for those parameters as water quality-based effluent limitations, *i.e.*, they are designed to protect the receiving stream from violations of state water quality standards. WVDEP, 2021 Fact Sheet at 11, 13, 15, 17, 19–20, Pl. Ex. A. Of those 1,130 violations, 607 exceed the permit limits by more than 10 times (1,000%), 152 exceed the permit limits by over 100 times (10,000%), and 23 exceed the permit limits by over 1,000 times (100,000%). The worst violation was in January 2025, when Amsted discharged water containing 14,000 nanograms per liter of benzo[b]fluoranthene, which is 368,321% over its permit limit of 3.8 ng/l. Compl. at App. A, No. 452. The Agency for Toxic Substances and Disease Registry has ranked that chemical tenth on its Priority List of Hazardous Substances, which lists the chemicals posing the most significant threat to human health. *Id.* ¶ 33.

Some of Plaintiffs' "members use, enjoy, and benefit from . . . [the] unnamed tributary to Anmoore Run and Anmoore Run, and indirectly into the downstream waters, including Elk Creek, the West Fork River and the Mono[n]gahela River. Their recreational interests include wading,

fishing, swimming, and generally enjoying the waters of those streams." *Id*. ¶ 12. "Plaintiffs' members, including Christa Clasgens and Nathan Rees, recreate in areas downstream from the" facility. *Id*. ¶ 13. Clasgens and Rees have "professional guide services for clients fishing in those waters," and "the members enjoy their visits to the affected waters less" due to Amsted's excessive discharges. *Id*.

Plaintiffs sent their notice of intent to sue on December 23, 2025, and filed their Complaint more than 60 days later on April 23, 2026. *Id.* ¶ 4. Amsted confirms that neither the EPA nor the West Virginia Department of Environmental Protection (WVDEP) filed a judicial enforcement action prior to that date. Amsted Mem. at 4. Neither agency has issued an order assessing penalties for the violations listed in Plaintiffs' Complaint, which began in November 2023. The 2022 EPA administrative consent order assessed penalties for violations occurring before July 2021 and the 2024 WVDEP administrative consent order assessed penalties for violations that occurred before November 2023. ECF No. 7-2 at 11–14; ECF No. 7-1 at 27–35.[1]

In the 2024 order, in place of the final permit limits in the 2021 permit, WVDEP purported to set "alternate interim limits" for eight parameters at Outlet 003, twelve parameters at Outlet 009, eleven parameters at Outlet 005, and one parameter at Outlet 030. ECF No. 7-1 at 7–8. This alternative scheme removed maximum limits for thirty of those parameters and removed average limits for two of them. *Id.* It also increased the average limits for thirty parameters by enormous amounts. *Id.* For example, here is the alternative scheme for Outlet 003:

[1] WVDEP also sent a letter in July 2025 demanding that Amsted pay stipulated penalties under the 2024 order for violations that occurred between March 13, 2024, and March 31, 2025. Stipulated penalties have no preclusive effect under 33 U.S.C. § 1319(g)(6). *PennEnvironment v. RRI Energy Ne. Mgmt.*, 744 F. Supp. 2d 466, 473 n.4 (W.D. Pa. 2010).

| **Outlet** | **Parameter** | **Type** | **Permit Limit** | **COA Interim Limit** |
|---|---|---|---|---|
| 003 | Benzo(A)Anthracene | Avg | 3.8 ng/l | 270.9 ng/l |
| 003 | Benzo(A)Anthracene | Max | 7.4 ng/l | Report only |
| 003 | Benzo(A)Pyrene | Avg | 3.8 ng/l | 332.1 ng/l |
| 003 | Benzo(A)Pyrene | Max | 11 ng/l | Report only |
| 003 | Benzo(B)Fluoranthene | Avg | 3.8 ng/l | 632.0 ng/l |
| 003 | Benzo(B)Fluoranthene | Max | 8.7 ng/l | Report only |
| 003 | Chrysene | Avg | 3.8 ng/l | 312.6 ng/l |
| 003 | Chrysene | Max | 7.3 ng/l | Report only |
| 003 | Dibenzo(A,H)Anthracene | Avg | 3.8 ng/l | 79.2 ng/l |
| 003 | Dibenzo(A,H)Anthracene | Max | 9.9 ng/l | Report only |
| 003 | Indeno(1,2,3-cd)Pyrene | Avg | 3.8 ng/l | 261.3 ng/l |
| 003 | Indeno(1,2,3-cd)Pyrene | Max | 10 ng/l | Report only |
| 003 | Temp. Diff. Discharge/Upstream | Max | 5.0 deg F | 9.6 deg F |

The order also purported to delay the compliance date for the listed parameters until January 1, 2026. *Id.* at 7 ¶ 2. In a November 2025 letter, WVDEP purported to amend the March 2024 order and extend the compliance deadline another full year until January 1, 2027. Pl. Ex. B at 1. Those WVDEP actions have no preclusive effect on citizens' ability to enforce the original permit limits and compliance deadline, because NPDES permits cannot be modified by administrative orders. *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 524–26 (4th Cir. 1999). But they demonstrate WVDEP's abject failure to enforce the final permit limits for toxic pollutants.

## Argument

### I. Citizen Plaintiffs under the CWA Are Enforcing a Private Right, Not Exercising Executive Power to Enforce Public Rights

Amsted argues that the CWA citizen suit provision violates separation-of-powers principles in the Take Care and Vesting Clauses because it authorizes citizens to seek penalties payable to the

U.S. Treasury. Amsted Mem. at 5. Amsted contends that this authorization infringes on the exclusive right of the Executive to enforce laws on behalf of the United States and vindicate public rights. *Id.* at 5–8. Amsted is mistaken, for two reasons. First, citizen suits are private actions. Second, the injunctions and civil penalties that citizen plaintiffs can seek redress private injuries.

### A. Citizen Suits Are Private Actions to Enforce Private Rights

Citizen suits are brought to redress harm to the plaintiff, namely, its environmental, recreational, and aesthetic interests in using waters that are not polluted by Amsted's discharges of excessive toxic pollutants. Citizen plaintiffs do not base their suits on any injury to the federal government. They sue on their "own behalf," 33 U.S.C. § 1365(a), not in the name of the United States. They can only sue if they have "an interest which is or may be adversely affected" by the defendant's violations. *Id.* § 1365(g). The CWA's harm requirement creates an actual case and controversy and eliminates any separation of powers concerns.

The CWA's text is clear enough, but Article III's distinct requirements reinforce that these suits will always address private harms. An Article III "injury-in-fact" must be "concrete and particularized." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). So long as the plaintiff alleges a particularized injury (which it must in order to have both statutory and constitutional standing), it is suing to vindicate private rights. Where a party "is pursuing legal process on its own behalf to prevent a legally cognizable injury to itself," it "is not endeavoring to 'take care that the laws be faithfully executed' or vindicate a general public interest in the proper administration of law." *U.S. House of Rep. v. U.S. Dep't of Com.,* 11 F. Supp. 2d 76, 96 (D.D.C. 1998); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 129 (1998) (Stevens, J., concurring) (explaining that it "is hard to see . . . how [an environmental statute's] citizen-suit provision impinges on the power of the Executive" where the private litigant had standing to sue and its suit was not merely based

upon "undifferentiated public interest" (internal quotation marks omitted)). "A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) (emphasis in original). But the Court "accept[s] the 'displacement of the democratically elected branches when necessary to decide an actual case.'" *Id.* (citation omitted).

The Supreme Court considers a right of action to be personal or private based on the type of injury sustained. The right is personal if the plaintiff feels the effects of the violation of federal law. *Davis v. Passman*, 442 U.S. 228, 235 n.10 (1979). A right is public, in contrast, if it "benefit[s] the public at large" rather than a "particular class" of persons. *California v. Sierra Club*, 451 U.S. 287, 297–98 (1981). The quintessential public right is the "undifferentiated public interest" in seeing the laws obeyed. *Lujan*, 504 U.S. at 577. The harm requirement in 33 U.S.C. § 1365(g) ensures that every citizen plaintiff personally feels the effects of CWA violations and that citizens cannot bring suit merely to ensure that the CWA is obeyed. Thus, CWA citizen suits are clearly private rights of action.

In contrast, "the interests that the United States may invoke to show standing are far broader than those of a private litigant for they encompass concerns that are sovereign, as well as proprietary or pecuniary in nature." *Wright & Miller*, 14 Fed. Prac. & Proc. Juris. § 3652 (4th ed.). "The obligations which [the United States] is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court." *In re Debs,* 158 U.S. 564, 584 (1895). It can sue to "prevent[] harm[] to 'the general welfare' and the 'public at large.'" *United States v. Texas*, 566 F. Supp. 3d 605, 641 (W.D. Tex. 2021).

This same distinction between private and public rights controls the conclusiveness of judgments in citizen and government enforcement actions under the CWA. Judgments in CWA enforcement actions brought by EPA are res judicata and binding on the general public and all potential citizen plaintiffs because "[t]he EPA is charged with enforcing the CWA on behalf of all citizens." *EPA v. City of Green Forest*, 921 F.2d 1394, 1404 (8th Cir. 1990). In contrast, a judgment in a citizen suit only binds the citizen plaintiff. Other citizen plaintiffs can bring successive actions against the same defendant if its violations continue despite the judgment in the prior citizen suit. *See Am. Littoral Soc. v. Brown Printing E., Inc.*, 1992 WL 13075 (E.D. Pa. Jan. 17, 1992). Moreover, a judgment in a CWA or Clean Air Act (CAA) enforcement action brought by citizens or state agencies does not preclude EPA from suing the defendant again for the same violations. *United States v. LTV Steel Co., Inc.*, 118 F. Supp. 2d 827, 835 (N.D. Ohio 2000) ("[I]t is permissible for the EPA to seek penalties against a defendant" for a CAA violation "even after that defendant has agreed to pay a penalty to a local environmental enforcement agency in connection with that same conduct."); *United States v. SCM Corp.*, 615 F. Supp. 411, 419–20 (D. Md. 1985) (same).[2] This non-mutuality of collateral estoppel means that EPA can bind all citizens but citizens cannot bind EPA. That would not be true if citizens were "standing in EPA's shoes" and enforcing a public right of action, as Amsted claims.

The same unequal treatment applies to statutes of limitations. The courts have applied those statutes unequally to citizen plaintiffs and the government in CAA and CWA enforcement actions. Under the concurrent remedy doctrine, if a legal claim for civil penalties is time-barred, then an equitable claim for injunctive relief for the same violations is also time-barred. That doctrine "does

[2] Analysis of CAA citizen suits applies to CWA citizen suits because the latter was modeled on the former. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987).

not apply to the government." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 676 (10th Cir. 2016). But a citizen plaintiff under the CAA cannot invoke that doctrine because it "is not the government, regardless of how it views its own role." *Id.* "A citizen suit under the CAA is brought on the plaintiff's 'own behalf.'" *Id.* (citing 42 U.S.C. § 7604(a)). "Private plaintiffs cannot be said to 'represent the public at large in the same way the government does when it brings suit to enforce the statute,' and thus are not eligible for the government's exemption." *Id.* (internal citation omitted); *accord Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1327 (11th Cir. 2007) (CAA); *StarLink Logistics Inc. v. ACC, LLC*, 653 F. Supp. 3d 462, 478 (M.D. Tenn. 2023) (CWA).

Similarly, EPA can enforce a broader scope of violations in its enforcement actions than citizens can enforce in a citizen suit. EPA can enforce both "wholly past" *and* continuing violations, while citizens can only enforce violations that are continuing at the time their complaint is filed. *Gwaltney*, 484 U.S. at 58 ("[C]itizens, unlike the [EPA] Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation."). By limiting citizens to actions to abate ongoing violations, Congress made citizen suits like private actions at common law to abate a public nuisance. Indeed, the Supreme Court has stated that CWA claims "resemble" public nuisance claims. *Tull v. United States*, 481 U.S. 412, 420 (1987). "The objective of [the CWA] is in some respects similar to that sought in nuisance suits." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 n.7 (1982). Again, this shows that citizen suits enforce private, not public, rights.

Because citizen suits are enforcing private rights and not exercising vested Executive authority to vindicate more general public rights, Amsted's arguments regarding prosecutorial discretion are inapposite. *See, e.g.*, Amsted Mem. at 15 ("Congress's vesting of executive power in private plaintiffs impairs the President's ability to employ prosecutorial discretion . . . .").

Indeed, citizen plaintiffs pursue their own claims to redress their own injuries, and do not displace the Executive's ability to file its own action, or not, to vindicate general public rights. Thus, because citizen plaintiffs do not exercise executive power, citizen suits do not interfere with prosecutorial discretion and raise no separation of powers concerns.

For these reasons, the United States has filed briefs supporting the constitutionality of citizen suits in five cases spanning more than forty years from 1984 through 2025. *See, e.g.*, United States Br. at 13–16, No. 24-13581, *U.S. ex rel. Clarissa Zafirov v. Fla. Med. Assocs.* (11th Cir. Jan. 6, 2025), Dkt. 39, Pl. Ex. C (arguing that individuals bringing "private suits under . . . the Clean Water Act" are "not exercising Executive power"); United States Br., No. 17-20545, *Env't Texas Citizen Lobby, Inc. v. Exxon Mobil Corp.* (5th Cir. Apr. 26, 2023), 2023 WL 3244278, at *6–7 ("CAA citizen suits raise no separation-of-powers concerns" and do "not infringe on the Executive Branch's Article II authority.").

"A citizen suit is a private action brought to redress harm to the plaintiff," which is "no different from any other lawsuit, such as an action brought in tort or in contract." United States Br., *N.C. Shellfish Growers Ass'n & N.C. Coastal Fed'n v. Holly Ridge*, No. 7:01-cv-36 (E.D.N.C. Aug. 15, 2001), 2001 WL 34572684. "There is nothing constitutionally suspect about these arrangements." *Id.* at *13. The United States also supported the constitutionality of the CWA citizen suit provision in 1984 in *Student Pub. Interest Research Grp. of N.J., Inc. v. Monsanto Co.*, No. 83-2040, 600 F. Supp. 1474 (D.N.J. 1985), Pl. Ex. D, and in 1987 in *Pub. Interest Research Grp. of N.J. v. Rollins Environmental Services, Inc.,* No. 86-3438 (D.N.J. 1987), Pl. Ex. E.

**B. Injunctions and Civil Penalties Redress Private Injuries**

The remedies available in citizen and EPA enforcement actions are the same—injunctions and civil penalties. 33 U.S.C. §§ 1319(d), 1365. But this identity of remedies does not transform a

private right into a public right. Injunctions and civil penalties are alternative remedies that are designed to deter future violations and redress private injuries.

To obtain an injunction, citizen plaintiffs must show irreparable harm *to themselves* and cannot rely solely on statutory violations or harm to the general public. *W. Va. Rivers Coalition v. Chemours Co.*, 178 F.4th 102, 114–16 (4th Cir. 2026) ("Irreparable harm to the public, without irreparable harm to the movant, is not enough."). Civil penalties similarly redress private injuries. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000), the Court stated that "[w]e have recognized on numerous occasions that 'all civil penalties have some deterrent effect.'" (citation omitted). The Court characterized civil penalties as "a sanction that effectively abates that conduct and prevents its recurrence," providing the citizen plaintiff with "a form of redress." *Id.* at 185–86. The Court concluded that "[s]uch penalties may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation." *Id.* at 174. Thus, both injunctions and civil penalties redress a citizen plaintiff's particularized injuries.

The same is true for compensatory and punitive damages in private tort actions. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *Warriner v. Stanton*, 475 F.3d 497, 500 (3d Cir. 2007) ("[E]very tort rule, to some extent, is designed both to deter and to compensate . . . ."). Punitive damages are "imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *see also Saunders v. Branch Banking & Tr. Co. of Va.,* 526 F.3d 142, 152 (4th Cir. 2008) (upholding statutory punitive damages awarded under the Fair Credit Reporting Act because they "comport[] with the underlying deterrent purpose of the [Act]").

Since injunctions, civil penalties, and damages all redress concrete and particularized injuries to plaintiffs, there is no separation-of-powers concern that plaintiffs without such injuries could seek those remedies merely to compel the violator to obey the law. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 347 (2016) (Thomas, J., concurring) ("The separation-of-powers concerns underlying our public-rights decisions are not implicated when private individuals sue to redress violations of their own private rights."). So long as private harm is demonstrated, "persons to whom Congress has granted a right of action . . . may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (internal citation omitted). In that sense, injunctions and civil penalties serve a dual purpose in furthering this public interest and redressing individual injury.

Nor does the regulatory effect of injunctions and civil penalties convert private rights into public rights. "[T]he question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place." *Franklin v. Gwinnett Cnty. Pub. Schools,* 503 U.S. 60, 65–66 (1992) (quoting *Davis*, 442 U.S. at 239). If federal courts declined to recognize remedies for express causes of action, it "would harm separation of powers principles in another way, by giving judges the power to render inutile [*i.e.,* useless or worthless] causes of action authorized by Congress." *Id.* at 74.

Indeed, CWA citizen suits are no different from any other lawsuit brought to protect private rights that are harmed by violations of federal statutes. There are 382 subsections of the U.S. Code associated with a private right of action, including actions to enforce securities, consumer protection, civil rights, and antitrust laws. *See Private Enforcement,* 114 Cal. L. Rev. at 143. And

the Supreme Court has long recognized that the creation of private rights of action and the selection of judicial remedies are decidedly legislative questions:

> How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by qui tam action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choices.

*Tigner v. Texas*, 310 U.S. 141, 148 (1940). Accordingly, the Court has recognized in no uncertain terms that "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner." *Davis*, 442 U.S. at 241. Indeed, the Court in *TransUnion* admonished courts to "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." 594 U.S. at 425. The dissenters were even more skeptical "of second-guessing private rights" established by Congress. *Id.* at 454 (Thomas, J., dissenting).

Plaintiffs in those 382 private rights of actions that Congress has created, including CWA citizen suits like this one, can seek remedies that redress their harm and serve public goals, such as injunctive relief, civil penalties and punitive damages. *See, e.g.*, 15 U.S.C. § 15 (Clayton Act; treble damages for antitrust violations); 42 U.S.C. § 2000a-3(a) (Title VII; punitive damages); *Smith v. Wade*, 461 U.S. 30, 51 (1983) (42 U.S.C. § 1983; punitive damages); 15 U.S.C. § 1681n(a)(2) (Fair Credit Reporting Act; punitive damages); 15 U.S.C. § 1640(a)(1)-(2)(a)(i) (Truth in Lending Act; actual damages plus a civil penalty not more than $4000 per violation); 47 U.S.C. § 277(b)(3) (Telephone Consumer Protection Act; minimum $500 civil penalty). If Amsted's argument were accepted, all of those private rights would be invalidated.

The United States has agreed with this conclusion. In its *amicus* brief in *Holly Ridge,* it stated that citizen suits seeking "penalties" payable to the "federal treasury" are constitutional because a citizen may obtain relief only if the "relief sought would deter further harmful violations of the law, thereby redressing harm to them." 2001 WL 34572684, at *11–12. And it is no matter that such relief also "serve[s] public goals in the course of advancing a private interest," because that dynamic is "pervasive throughout the law." *Id.* at *11.

## II. Citizen Suits Do Not Violate Separation of Powers Principles Because the Executive Branch Does Not Have Exclusive Power to Enforce Federal Law and Recover Civil Penalties

Amsted is also wrong that the Take Care and Vesting Clauses in the Constitution vest exclusive authority in the Executive Branch to enforce federal law and recover civil penalties, for four reasons. First, as explained in Section I above, the Supreme Court's decision in *Laidlaw* forecloses the argument that injunctions and civil penalties are purely public remedies and shows that citizen plaintiffs enforce private, not public, rights. Second, in *Morrison v. Olson*, the Supreme Court upheld the constitutionality of independent counsels who exercise executive power and in doing so rejected the argument that executive power to enforce federal law resides exclusively in the Executive Branch. Third, courts have consistently upheld the constitutionality of *qui tam* statutes that, unlike citizen suits, allow private plaintiffs to enforce federal laws based solely on governmental injury. Fourth, historical scholarship demonstrates that private enforcement of regulatory law was commonplace in England, colonial American, and the Early Republic.

### A. Citizen Suit Plaintiffs Have Less Authority than Independent Counsels, which the Supreme Court Found to be Constitutional in *Morrison v. Olson*

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court considered the degree to which Congress may assign prosecutorial powers to persons that are not under the control of the Executive Branch. It rejected the argument that only the Executive Branch has the power to enforce

federal laws and to prosecute violations of those laws. *Id.* at 695–96.

The Court in *Morrison* addressed the constitutionality of the Ethics in Government Act's independent counsel provisions. That Act "allows for the appointment of an 'independent counsel' to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws." *Id*. at 660. The independent counsel clearly performed executive-style functions, "in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch." *Id*. at 691. However, the Court held that the independent counsel was too inferior an officer, "with limited jurisdiction and tenure and lacking policymaking or significant administrative authority," to warrant finding the statute unconstitutional. *Id*. The Court also concluded that the Act gave the Executive Branch "sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id*. at 696. Thus, *Morrison* demonstrates that the power to enforce federal law is not reserved exclusively to Executive Branch officials.

*Morrison* is still good law. The Court reaffirmed that decision in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), stating that,

> [a]lthough the independent counsel was a single person and performed "law enforcement functions that typically have been undertaken by officials within the Executive Branch," we concluded that the removal protections did not unduly interfere with the functioning of the Executive Branch because "the independent counsel [was] an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority."

*Id.* at 217–18 (citation omitted). Amsted quotes the Court's observation in *Seila Law* that the power of the Consumer Financial Protection Bureau (CFPB) "to seek daunting monetary penalties against private parties on behalf of the United States" is a "quintessentially executive power." Amsted Mem. at 19 (quoting 591 U.S. at 219). But that statement does not mean that every suit seeking

penalties is an exercise of Executive power. In *Seila Law*, the CFPB was an "independent administrative agency" designed to pursue the public interest broadly, by "'implement[ing] and enforc[ing]' a large body of financial consumer protection laws." 591 U.S. at 203, 206 (quoting 12 U.S.C. § 5511(a)); *see also Trump v. Slaughter*, 146 S.Ct. 2283, 2305 (2026) (discussing the Federal Trade Commission's "in-house adjudications" and "fil[ing of] civil suits on behalf of the United States" for any relief "necessary to redress injury to consumers," including civil penalties).[3] Those civil penalties would not address any particularized harm to the plaintiff but would be brought to vindicate public rights, generally—a "quintessentially executive power." *Seila Law*, 591 U.S. at 219. But that does not in any way undermine the Supreme Court's recognition that private parties can use penalties to seek personalized relief by abating "the threat of future injury" to them. *Laidlaw*, 528 U.S. at 185–87.

Compared to citizen plaintiffs, the independent counsel under the Ethics in Government Act exercised much more expansive powers. It had much broader investigative authority, prosecutorial discretion, and authority to use the resources of the U.S. government than does a citizen plaintiff under the CWA. Citizen plaintiffs have no power to investigate or prosecute crimes. The CWA does not designate any citizen plaintiff to any government office. No government official appoints citizen suit plaintiffs. Citizen suit plaintiffs are not employees of the United States. They are not supervised by any federal employee or officer. They receive no salary or other payment for their work. They use none of the government's resources to bring their suits

[3] While Amsted cites *Slaughter* favorably throughout its brief, it did not overrule *Morrison* and is wholly inapposite to this case. Rather, *Slaughter* addressed the President's power under Article II to remove officers of independent executive agencies. The Court determined that those "officers exercise the *President's* power, not their own, and thus must be *responsible* to him." *Slaughter*, 146 S. Ct. at 2310 (emphasis in original). But, as explained in Section I, citizen plaintiffs wield no executive power at all. Thus, *Slaughter* is neither decisive nor persuasive to this case.

other than the federal court system. Thus, as private citizens seeking redress of their personal injuries, they exercise no Executive authority.

Furthermore, the CWA incorporates numerous features that operate to limit interference by citizen suits with governmental enforcement actions and to avoid constraining Executive power. Citizens cannot sue if a State or EPA has already commenced and is diligently prosecuting the same violations. 33 U.S.C. § 1365(b)(1)(B). Citizens cannot seek civil penalties if a State or EPA has already commenced and is diligently prosecuting an administrative penalty proceeding under a comparable statute. *Id.* § 1319(g)(6). Citizens cannot sue unless they send a pre-suit notice letter to the federal and state government identifying the alleged violations. *Id.* § 1365(a)(1)(A). In response to that letter, the governments have a "right of first refusal to bring an enforcement action." *NRDC v. Outboard Marine Corp*., 692 F. Supp. 801, 817 (N.D. Ill. 1988). EPA can also foreclose a citizen suit by bringing its own action after the notice letter is sent. *Green Forest*, 921 F.2d at 1404. EPA can enforce the CWA in a separate parallel action and move to consolidate it with a pending citizen suit. *United States v. U.S. Steel Corp.*, 2024 WL 1191716 (N.D. Ind. Mar. 19, 2024). A citizen suit settlement cannot be entered until 45 days after it has been served on the U.S. Department of Justice, which can comment on it or intervene to oppose it. 33 U.S.C. § 1365(c)(3); *Sierra Club v. Elec. Controls Design*, 909 F.2d 1350, 1352 (9th Cir. 1990). The United States is not bound by citizen suit settlements and may "bring its own enforcement action at any time." *Elec. Controls Design*, 909 F.2d at 1356 n.8.

Thus, because citizen plaintiffs have less authority than independent counsels, and given that the CWA contains multiple safeguards to ensure that citizen actions do not constrain Executive authority, the CWA's citizen suit provision is constitutional.

### B. Citizen Suits Plaintiffs Have Less Authority than *Qui Tam* Plaintiffs and Courts Have Found *Qui Tam* Suits to be Constitutional

Courts have compared citizen suits to *qui tam* suits. *See, e.g.*, *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987); *Outboard Marine*, 692 F. Supp. at 817; *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 449 (D. Md. 1985) (CWA citizen suit "has many of the attributes of a *qui tam* action."). In *qui tam* suits, however, the plaintiff sues on behalf of the government and receives a share of the penalty as a bounty. Currently, the primary *qui tam* statute is the False Claims Act (FCA), which authorizes private plaintiffs (relators) to sue in the name of the United States to recover government payments made to contractors that assert fraudulent claims. 31 U.S.C. §§ 3729–33. FCA relators can recoup up to thirty percent of the funds recovered. *Id.* § 3730(d). FCA relators displace the Executive and enforce purely public rights and injuries. They rely entirely on the federal government's injury and financial loss for their standing in federal court.

The Supreme Court has upheld *qui tam* statutes even though *qui tam* relators have no interest in the action other than a share of the funds recovered. *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 541 (1943); *Marvin v. Trout*, 199 U.S. 212 (1905). In 2000, the Court held that FCA relators have Article III standing to sue. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000). The Fourth Circuit has also so held. *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 404 (4th Cir. 2013) (holding "relators seeking solely civil penalties enjoy standing to sue"). All six courts of appeal that have considered Article II challenges to *qui tam* statutes have held that they are constitutional. *See U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 92 Fed. Appx. 708, 727 (10th Cir. 2004), *rev'd on other grds. sub nom. Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *U.S.*

*ex rel. Kelly v. Boeing Co*., 9 F.3d 743 (9th Cir. 1993); *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp*., 985 F.2d 1148 (2d Cir. 1993); *U.S. ex rel. Zafirov v. Fla. Med. Assocs*., No. 24-13581, 2026 WL 2581886 (11th Cir. Sept. 1, 2026).

In *Kelly,* the Ninth Circuit rejected Boeing's argument that only the Executive Branch has the power to enforce federal laws and prosecute violations, concluding that "no such absolute rule exists." 9 F.3d at 751. The court of appeals read *Morrison* to counsel that "prosecutorial functions need not always be undertaken by Executive Branch officials." *Id*. Consequently, Congress can constitutionally assign some enforcement power to private citizens. The Ninth Circuit also concluded that the FCA did not encroach too far on Executive powers, finding that "an independent counsel exercises broader investigative authority, prosecutorial discretion, and authority to use the resources of the U.S. government than does a qui tam relator." *Id* at 752–53. The *Kelly* court refused to read Supreme Court precedent as creating "an absolute rule that only executive officers may initiate any type of litigation in the name of the United States" or to view absolute Executive control over the initiation of lawsuits as a *per se* constitutional requirement. *Id*. at 754 & n.13.

Citizen plaintiffs have a "more particularized interest" than relators in FCA *qui tam* suits. *Steel Co.,* 523 U.S. at 129 (Stevens, J., concurring). *Qui tam* relators rely entirely on the federal government's injury for their standing. The government and the relator seek to redress the same injury to the government. Citizen suit plaintiffs, in contrast, must demonstrate their own individual injury that the court can redress by enjoining or penalizing the violator. Their injuries are personal and are different from the broader public injury to the sovereign. *Qui tam* relators bring suit in the government's name, for themselves and for the government, while citizen suit plaintiffs bring suit only in their own names, and only for themselves. *Qui tam* relators receive a share of the penalties, while citizen suit plaintiffs do not.

In sum, citizen plaintiffs have limited authority to sue on their own behalf, and that authority is much less than the authority of independent counsels and *qui tam* relators to sue on behalf of the government. Therefore, like the independent counsel and *qui tam* provisions, citizen suit provisions do not violate separation of powers principles. As a result, every court which has considered the issue has agreed that citizen suits under the CWA[4] and similar federal statutes[5] are constitutional. If this Court accepted Amsted's argument, its decision would be inconsistent with *Morrison, Stevens,* the six courts of appeals that have upheld *qui tam* statutes, the eight district courts that have upheld the CWA citizen suit provision, and the six appellate and district courts that have upheld similar citizen suit provisions in other federal statutes.

**C. Historical Scholarship Demonstrates That Private Enforcement of Regulatory Law Was Commonplace in England, Colonial American, and the Early Republic**

Amsted argues that "citizen suits have no foothold in history or tradition." Amsted Mem. at 22. On the contrary, there is a "long tradition of *qui tam* actions in England and the American Colonies." *Stevens*, 529 U.S. at 774. *Qui tam* suits are "deeply rooted in our history." *Steel Co.*, 523 U.S. at 129 (Stevens, J., concurring). "Statutes providing for actions by a common informer,

---

[4] *See, e.g.*, *N.C. Shellfish Growers Ass'n v. Holly Ridge Associates,* 200 F. Supp. 2d 551, 555–56 (E.D.N.C. 2001)*; Waterkeeper All. v. Smithfield Foods,* No. 4:01-cv-27-H(3), 2001 WL 1715730, at *5 (E.D.N.C. Sept. 20, 2001); *Atl. States Legal Found. v. Universal Tool & Stamping,* 735 F. Supp. 1404, 1419–20 (N.D. Ind. 1990); *NRDC v. Shell Oil,* No. 87-5249 (S.D. Ill. Feb. 16, 1989), Pl. Ex. F; *Sierra Club v. Port Townsend Paper,* No. C87-316C (W.D. Wash. May 2, 1988), Pl. Ex. G; *NRDC v. Outboard Marine,* 692 F. Supp. 801, 815–17 (N.D. Ill. 1988); *Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto Co.,* 600 F. Supp. 1474, 1478–79 (D.N.J. 1985); *Chesapeake Bay Found. v. Bethlehem Steel,* 652 F. Supp. 620, 623–26 (D. Md. 1987).

[5] *Env't Tex. Citizen Lobby v. ExxonMobil*, 123 F.4th 309, 342–43 (5th Cir. 2024) (opinion of Davis, J.) (CAA); *Sierra Club v. Franklin Cnty. Power*, No. 05-cv-4095-JPG, 2006 WL 8455938, at *9–10 (S.D. Ill. October 17, 2006) (same); *United States v. Am. Elec. Power*, 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001) (same); *Legal Center v. Iowa Values*, 573 F. Supp. 2d 243, 256 (D.D.C. 2021) (Federal Election Campaign Act); *Del. Valley Toxics Coal. v. Kurz-Hastings Inc.*, 813 F. Supp. 1132, 1138 (E.D. Pa. 1993) (Emergency Planning and Community Right-to-Know Act); *Atl. States Legal Found. v. Buffalo Envelope*, 823 F. Supp. 1065, 1072–76 (W.D.N.Y. 1993) (same).

who himself ha[s] no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government." *U.S. ex rel. Marcus v. Hess,* 317 U.S. 537, 541 n.4 (1943) (internal quotation marks and citation omitted). That tradition of allowing private actions for public wrongs is "particularly relevant" to the constitutionality of such actions. *Stevens*, 529 U.S. at 774.

*Qui tam* suits can be traced back over 600 years in Anglo-American law. In 1388, Richard II and the English Parliament enacted a statute designed to cleanup and prevent water pollution. It provided for a dual system of enforcement: either public officials or private parties who 'feel themselves grieved' or who 'will complain' could bring enforcement actions. Boyer, *Privatizing Regulatory Enforcement: A Preliminary Assessment of Citizen Suits Under Federal Environmental Laws*, 34 Buff. L. Rev. 833, 946–47 (1985).

The First Congress "enacted a considerable number of informer statutes." *Stevens,* 529 U.S. at 776. Some of them provided both a bounty and an express cause of action, while others provided a bounty only. *Id.* at 776–77. The Framers (including John Adams, Thomas Jefferson, James Madison, and Alexander Hamilton) understood and participated in this legal culture of private enforcement. *Private Enforcement,* 114 Cal. L. Rev. at 137. For example, just a few months after writing the *Federalist Papers*, Hamilton himself drafted a tax law enforceable by "any informer" as a Representative in the New York State Assembly. *Id.* at 172.

The Dodge case provides particularly telling historical evidence that Article II does not give the President exclusive control over prosecution of statutory violations. *See Private Enforcement,* 114 Cal. L. Rev. at 137. A customs officer, Samuel Dodge, permitted a vessel to unload molasses in the dark in violation of the 1790 customs act. *Id.* at 137, 173. Dodge was indicted by a private informer suing in the name of the United States for a $400 fine to be split

between the informer and the government. *Id.* Dodge asked George Washington for a pardon, who requested the advice of Hamilton, who was the first Treasury Secretary. *Id.* Hamilton's lawyers said Washington could only remit the United States' portion of the fine. *Id.* Hamilton and Washington accepted this advice, agreeing that the Executive had no power to displace the penalty awarded to the private informer, even when the claim was brought in the name of the United States. *Id.* This case vividly illustrates that the Framers did not believe that the Executive had exclusive control over enforcement of federal statutes.

In *Stevens,* Justice Scalia concluded that historical evidence is "well nigh conclusive with respect to the question before us here: whether *qui tam* actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" 529 U.S. at 777 (citation omitted). Although the *Stevens* Court declined to address whether *qui tam* provisions violated Article II, *id.* at 778 n.8, the long history of those provisions is relevant to the Article II question. The *en banc* Fifth Circuit concluded that it was "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* . . . is similarly conclusive with respect to the Article II question." *Riley*, 252 F.3d at 752.

As we have explained above, citizen suits are unlike *qui tam* suits because they enforce private, rather than public, rights of action. But the fact that private exercises of government authority to rectify public wrongs in *qui tam* actions have existed since the Founding Era shows that there is no constitutional violation when private actions serve public purposes. This historical evidence is entitled to "great weight" in discerning the meaning of the Constitution. *Bands of State of Wash. v. United States*, 279 U.S. 655, 689 (1929).

## III. Citizen Suits Do Not Violate the Private Nondelegation Doctrine

In addition to its separation of powers arguments, Amsted also argues that the CWA citizen suit provision vests federal executive power in private parties and thereby violates the private

nondelegation doctrine. Amsted Mem. at 8–15.[6] The CWA does not violate that doctrine because, as explained in Section I, citizen plaintiffs only enforce private rights and do not exercise Executive power.

In any event, with one exception, the cases Amsted cites all involve the delegation of *legislative* power to private parties outside the Executive Branch and are therefore inapposite. *Pittston Co. v. United States*, 368 F.3d 385, 393–94 (4th Cir. 2004) (delegating power to collect and spend benefits for retired coal miners); *FCC v. Consumers' Rsch.*, 606 U.S. 656, 663 (2025) (delegating power to collect revenue for communications services in underserved areas); *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43 (2015) (delegating power to develop standards to evaluate performance of Amtrak's intercity passenger trains); *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) (delegating rulemaking authority over miners); *Oklahoma v. United States*, 163 F.4th 294 (6th Cir. 2025) (delegating rulemaking authority over horseracing).

Those cases are inapposite because citizen plaintiffs under the CWA do not exercise any legislative or rulemaking authority. They are only enforcing permit limits and conditions set by the permit-writing agency (*i.e.*, the State or EPA). Citizens cannot use a citizen suit to revisit the validity of the conditions in the permit that they are seeking to enforce. *Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95, 105 (9th Cir. 2024). As Congress stated when it enacted the CWA,

> [t]he standards for which enforcement would be sought either under administrative enforcement or through citizen enforcement procedures are the same. Therefore the participation of citizens in the courts seeking enforcement of water pollution control requirements should not result in inconsistent policy. Whether abatement is sought by an agency or by a citizen, there should be a considerable record available to the courts in any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures. Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought,

[6] Nondelegation and Appointment Clause arguments are mutually exclusive. The former asserts that plaintiffs are private actors and the latter asserts that they are government actors. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 250–51 (5th Cir. 2026).

> and the issue before the courts would be a factual one of whether there had been compliance.

S. Rep. No. 414, 92d Cong., 1st Sess. 80 (1971).

Unlike these cases involving delegations of legislative power, *Nat'l Horsemen's* involved the delegation of *executive* power to private parties. The Fifth Circuit held that the Horseracing Integrity and Safety Act (HISA) unconstitutionally delegated executive power to a private corporation, the Horseracing Integrity and Safety Authority (the Authority), to enforce violations of that statute. 178 F.4th at 239–40. The Sixth Circuit has disagreed and held that the delegation is constitutional. *Oklahoma v. United States*, 62 F.4th 221, 231–32 (6th Cir. 2023), *vacated and remanded for further consideration in light of FCC v. Consumers' Rsch.,* 606 U.S. 656 (2025). Both cases were facial challenges to the statute, not as-applied Article II challenges to individual enforcement actions, and their holdings are limited in that respect.

Even so, *National Horsemen's* is not persuasive because the CWA does not give citizens the type of power granted to the Authority. Congress gave the Authority "the *sole* power to sue in federal court to enforce" the HISA. *Nat'l Horsemen's*, 178 F.4th at 245 (emphasis added); *see* 15 U.S.C. § 3054(j)(1) (the Authority can "commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation of" the Act or rules thereunder). "HISA gives that power *exclusively* to the Authority." *Nat'l Horsemen's*, 178 F.4th at 245 (emphasis added).[7] That exclusivity demonstrates that the Authority is exercising purely Executive power to enforce undifferentiated public rights without

[7] In creating the Authority, Congress essentially gave the full powers of a federal agency to a private nonprofit organization. The Authority was empowered to "write[] all the rules" regarding thoroughbred racing across the country, in addition to enforcing those rules. *Nat'l Horsemen's*, 178 F.4th at 231. Because it exercised all of the power of a federal agency it had to be sufficiently "subordinate" to Executive Branch control. *Id.* at 238–39 & 247 n.9.

any need to show injury to itself. In contrast, citizen plaintiffs have no exclusive prosecutorial power and do not enforce public rights. They can only enforce their own private rights after demonstrating a particularized injury to themselves. Citizen suits do not bind EPA. EPA can enforce not only the same violations, but also "wholly past" violations that citizens cannot enforce.[8] The *Nat'l Horsemen's* case therefore does not apply to the CWA and does not support Amsted's private nondelegation argument.

## IV. Citizen Suits Do Not Violate the Appointments Clause Because They Assert Private Rights and Supplement Government Enforcement

Finally, Amsted argues that citizen plaintiffs are officers requiring appointment under the Appointments Clause because they exercise "significant authority pursuant to the laws of the United States." Amsted Mem. at 19–21. According to Amsted, that clause does not allow private parties—as opposed to "Officers of the United States"—to conduct civil litigation in the courts of the United States for vindicating public rights. *Id.* The central premise of this argument is that citizen plaintiffs are unappointed officers who hijack and displace Executive authority to enforce public rights.

However, a citizen plaintiff is not vested with any government power because he sues "on his own behalf," not on behalf of the government. Citizen plaintiffs are private citizens seeking redress for their personal injuries. Judgments in CWA citizen suits are not binding on the United States. EPA can bring its own action for the same violations. *Supra* Section I.A at 6–7. Nor do citizen-plaintiffs hold a "continuing position" as required for the Appointments Clause to apply.

[8] Furthermore, unlike the Fifth Circuit, the Sixth Circuit declined to address the constitutionality of the Authority's authority to file civil enforcement actions because the parties did not brief the "founding-era or contemporary analogs showing the role private entities may, and may not, play in law enforcement." *Oklahoma*, 62 F.4th at 233. In that respect, as explained in Section II.C, there is extensive historical evidence supporting that type of private enforcement of public rights through *qui tam* actions.

*Zafirov*, 2026 WL 2581886, at *1. Consequently, citizens are not government "officers" within the meaning of the Appointments Clause. *Id.*; *Bethlehem Steel*, 652 F. Supp. at 624.

Furthermore, the Supreme Court has stated that CWA citizen suits are "meant to supplement rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60. In that sense, they are like private enforcement actions under other statutes, including the Clayton Act and the Racketeer Influenced and Corrupt Organizations Act (RICO). Private actions under Section 16 of the Clayton Act do not violate the Appointments Clause because they are meant to "'supplement[] Government enforcement of the antitrust laws.'" *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 154 (D.D.C. 2002) (quoting *United States v. Borden*, 347 U.S. 514, 518 (1954)). "'[P]rivate and public [antitrust] actions were designed to be cumulative, not mutually exclusive.'" *Id.* (quoting *Borden*, 347 U.S. 518). Both the Clayton Act and RICO "share a common congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices." *Rotella v. Wood*, 528 U.S. 549, 557 (2000). Thus, private suits that supplement government enforcement do not violate the Appointments Clause because they do not assert, displace or restrict government power. *See Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 292 (1st Cir. 2006) ("[A]llowing citizen suits to proceed is not the functional equivalent of allowing courts to hijack EPA's regulatory authority and weave safety standards out of whole cloth.").

**Conclusion**

For these reasons, CWA citizen suits are constitutional and Amsted's motion to dismiss should be denied.

DATED: September 2, 2026

Respectfully submitted,

**/s/ Mike Becher**
MIKE BECHER (WVBN 10588)
AMANDA DEMMERLE (WVBN 13930)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 11571
Charleston, WV 25339
Telephone: (304) 382-4798
Email: mbecher@appalmad.org
ademmerle@appalmad.org

**/s/ James M. Hecker**
JAMES M. HECKER (*PRO HAC VICE*)
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Email: jhecker@publicjustice.net

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, J. Michael Becher, hereby certify that on September 2, 2026, I filed the foregoing Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss through the Court's ECF system, which will provide service and notification to the following:

**Allyn G. Turner**
Spilman Thomas & Battle PLLC
300 Kanawha Blvd E
P. O. Box 273
Charleston, WV 25321-0273
304-340-3800
Fax: 304-340-3801
Email: aturner@spilmanlaw.com

**Damien M. Schiff**
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
916-419-7111
Fax: 916-419-7747
Email: dschiff@pacificlegal.org

**David M Flannery**
Steptoe & Johnson PLLC-Charleston
P.O. Box 1588
707 Virginia St., East, Suite 1700
Charleston, WV 25326-1588
(304) 353-8171
Fax: (304) 353-8183
Email: Dave.Flannery@steptoe-johnson.com

**Devon Joseph Stewart**
Steptoe & Johnson PLLC
P.O. Box 1588
Charleston, WV 25326
304-353-8188
Fax: 304-933-8703
Email: dstewart@lewisgianola.com

**Kathy G Beckett**
Steptoe & Johnson PLLC-Charleston
P.O. Box 1588
707 Virginia St., East, Suite 1700
Charleston, WV 25326-1588
(304) 353-8172
Fax: (304) 353-8183
Email: Kathy.Beckett@steptoe-johnson.com

**Peter J. Raupp**
Steptoe & Johnson PLLC-Charleston
P.O. Box 1588
707 Virginia St., East, Suite 1700
Charleston, WV 25326-1588
(304) 353-8125
Fax: (304) 353-8180
Email: peter.raupp@steptoe-johnson.com

**Sean J. Radomski**
Pacific Legal Foundation 3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
202-888-6881
Fax: 916-419-7747
Email: sradomski@pacificlegal.org

/s/ J. Michael Becher
J. Michael Becher