**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

| | |
|---|---|
| WEST VIRGINIA RIVERS COALITION and WEST VIRGINIA HIGHLANDS CONSERVANCY,<br><br>Plaintiffs,<br><br>v.<br><br>AMSTED GRAPHITE MATERIALS LLC,<br><br>Defendant. | No. 1:26-cv-00046-TSK |

**<u>REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COMPLAINT</u>**

Plaintiffs' Opposition ("Opp.") incorrectly paints Amsted as a chronic polluter that has done nothing to abate the environmental problems at its facility and WVDEP as a do-nothing agency. This narrative is little more than an attempt to distract this Court from what are purely questions of law. Regardless of Plaintiffs' skewed narrative, the Constitution does not permit Plaintiffs' claim. Moreover, this narrative ignores the significant efforts by Amsted, EPA, and WVDEP—spanning the past two presidential administrations—to improve the facility's environmental impact. Amsted only became responsible for the WV/NPDES Permit in July 2020, after acquiring an ownership interest in the facility a month earlier. *See* ECF No. 7-1 at ECF p. 3.

From the beginning, Amsted was confronted with a neglected site that required it to dedicate significant resources to address environmental compliance. Over the course of the next several years, and under more stringent standards than the prior owner was held to, Amsted worked cooperatively with WVDEP and EPA to address compliance with the Permit, including entering comprehensive consent orders with both agencies. *See* ECF Nos. 7-1, 7-2. Amsted stipulated in its WVDEP consent order to pay $2,000 per day for any failure to reach agreed upon milestones. *See* ECF No. 7-1 at ECF p. 9. To date, Amsted has been assessed and agreed to pay $875,091 for

violations that occurred both prior to *and since* the entry of the two consent orders. *See* ECF No. 8 at 4 n.3 ("Motion" or "Mot."). Also, Amsted has expended significant time developing and implementing a Plan of Corrective Action. *See* ECF No. 7-1 at ECF pp. 42-45. This is not a record of abject failure. *Contra* Opp. at 4. Instead, it shows a company that, at great cost, has worked diligently and cooperated with both EPA and WVDEP to solve problems that it inherited. Regardless, for the following purely legal reasons, the Court should grant the Motion.

## I. The Court Should Ignore Plaintiffs' Article III Strawman

The Motion showed that Congress violated Article II and impermissibly vested executive power in Plaintiffs by allowing them to (1) seek civil penalties payable to the U.S. Treasury; and (2) pursue a lawsuit seeking to vindicate public rights. *See* Mot. at 5-8. Although Defendant did not challenge standing, Plaintiffs respond by building up and attacking an Article III strawman. *See* Opp. at 4-13. This misdirection wrongly conflates arguments about Article III with arguments about Article II, which raise different questions. Article III asks whether a plaintiff has "standing." If the answer is yes, courts can proceed to merits questions, such as whether a statute is unconstitutional. *Seila Law LLC v. CFPB*, 591 U.S. 197, 209-11 (2020) ("When the plaintiff has standing, 'Article III does not restrict the opposing party's ability to object to relief being sought at its expense.'" (quoting *Bond v. United States*, 564 U.S. 211, 217 (2011))). Article II asks if a private plaintiff is wielding "executive power." If the answer is yes, this triggers the private nondelegation doctrine and other constitutional review. *See* Mot. at 8-18.

That these are distinct concepts is highlighted by two of Plaintiffs' cases. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.* held that CWA citizen plaintiffs have Article III standing, while Justices Kennedy, Scalia, and Thomas clarified that the Article II issue was still open. 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *id.* at 209-10 (Scalia, J., dissenting). *Vermont Natural Resources Agency v. United States ex rel. Stevens* held False Claims Act ("FCA")

*qui tam* relators have Article III standing but "express[ed] no view on the question whether *qui tam* suits violate Article II." 529 U.S. 765, 778 n.8 (2000). If standing and executive power were the same thing, why would the Supreme Court explicitly reserve on the Article II question?

Trying to duck the obvious answer, Plaintiffs pivot by claiming "the long history of [*qui tam*] provisions is relevant to the Article II question." *See* Opp. at 21. This is wrong because history plays a different role in Article III and Article II cases. For Article III, courts examine whether there are "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Stevens*, 529 U.S. at 774 (citations omitted). Thus, "the long tradition of *qui tam* actions in England" was relevant to the Article III question because the existence of pre-ratification English *qui tam* practice showed that FCA *qui tam* actions are amenable to, and resolved by, the judicial process. *Id.* However, not every English common law practice is necessarily relevant to Article II. *Cf. Van Ness v. Pacard*, 27 U.S. (2 Pet.) 137, 144 (1829) ("The common law of England is not to be taken in all respects to be that of America. Our ancestors . . . brought with them and adopted only that portion which was applicable to their situation.").[1]

This is because "the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited." *U.S., ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting) (citation omitted); *see Bowsher v. Synar*, 478 U.S. 714, 722 (1986) (Our government is "[u]nlike parliamentary systems such as that

[1] One aspect of English common law that our ancestors adopted was the Blackstonian distinction of public versus private rights, wrongs, and remedies. *See* Mot. at 6-7 (quoting *Huntington v. Attrill*, 146 U.S. 657, 668-69 (1892)). The Motion relied on William Blackstone's *Commentaries* because, along with John Locke and Baron de Montesquieu, his writings most influenced the Framers regarding the original public meaning of the phrase "the executive power." *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134-35 (11th Cir. 2021) (Newsom, J., concurring).

of Great Britain" because the "Framers provided . . . a separate and wholly independent Executive Branch[.]"). Plaintiffs' attempt to justify CWA citizen suits with the history of English *qui tam* actions is based on the flawed premise that, because the American colonists objected to the King's abuses, the Executive created by Article II is necessarily weaker than the English monarch. "In fact, our Constitution's executive is stronger than the English counterpart in at least one very significant respect. While the English executive's powers were subject to modification by ordinary legislation . . . our executive's powers can never be altered by statute." Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 717-18; *see United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000) (The Framers "[d]epart[ed] from their parliamentary past[.]"). Therefore, Plaintiffs are wrong that the "history of [*qui tam*] provisions is relevant to the Article II question" of CWA citizen suits. *See* Opp. at 21.

## II. Properly Understood, Vertical Stare Decisis Supports Defendant

The Motion established that the Supreme Court's Article II and private nondelegation doctrine precedents support Defendant. Plaintiffs attempt to brush them aside—especially *Seila Law* and *Slaughter*—by limiting them to their holdings. *See* Opp. at 14-15 & n.3. But by myopically focusing on their holdings, Plaintiffs ignore that "just as binding as [a] holding is the reasoning underlying it." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019). To see how precedential reasoning supports Defendant, consider *Seila Law*, which held that Congress's restriction on the President's ability to remove the CFPB Director violated Article II. 591 U.S. at 213. To reach this holding, the Court first had to determine if the Director exercised executive power. *Id.* at 218-19. The Court reasoned the Director exercised executive power because, *inter alia*, the Director could "seek daunting monetary penalties against private parties" payable to the U.S. Treasury, which the Court termed "a quintessentially executive power." *Id.* at 219. Likewise, in *Trump v. Slaughter*, which held that restrictions on the President's ability to remove FTC commissioners violate Article

II, the Court also had to determine whether the FTC exercised executive power. 146 S. Ct. 2283, 2304-05 (2026). The Court reasoned the FTC exercised executive power because, *inter alia*, it "files civil suits" seeking "injunctions" and "civil penalties." *Id.* at 2305.

Under this binding reasoning, Plaintiffs' pursuit of an injunction and civil penalties payable to the U.S. Treasury constitutes executive power. It makes no difference that in *Seila Law* and *Slaughter*, the wielding of executive power implicated the removal power, whereas here, the wielding of executive power triggers the private nondelegation doctrine and Executing Vesting and Take Care Clauses. Thus, proper application of vertical stare decisis supports Defendant.

Plaintiffs' attempt to distinguish Amsted's private nondelegation doctrine cases fares no better. By complaining that Defendant cites cases "involv[ing] the delegation of *legislative* power to private parties," *see* Opp. at 22, Plaintiffs make a distinction that does not appreciate how this doctrine works. The same private nondelegation test applies regardless of whether the private actor is wielding "legislative, executive, [or] judicial power." *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022). Therefore, because *Consumers' Research*, *Carter Coal*, and *Pittston* set out the applicable test, this Court must apply it even though Plaintiffs wield executive, and not legislative, power.[2] The Motion outlined this test, *see* Mot. at 8-9, but Plaintiffs did not engage with it. Instead, they put all their eggs in one basket by arguing they do not wield executive power. Thus, if this Court holds Plaintiffs wield executive power, it should adopt Defendant's unrebutted application of the controlling test. *See* Mot. at 9-15.

---

[2] Plaintiffs' claim that "rulemaking authority" constitutes "legislative power" underscores that they do not grasp what constitutes "executive power." *Slaughter*, 146 S. Ct. at 2304-05 ("[T]he power to promulgate substantive rules that carry the force of law" constitutes executive power.). Plaintiffs are wrong that "the Sixth Circuit declined to address the constitutionality of the Authority's authority to file civil enforcement actions." *See* Opp. at 24 n.8. The Motion discussed *Oklahoma*'s upholding of the enforcement power and distinguished it. *See* Mot. at 13.

Equally unpersuasive is Plaintiffs' discussion of *Black III*, which held that the enforcement provisions of the Horseracing Integrity and Safety Act ("HISA") facially[3] violate the private nondelegation doctrine. *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 178 F.4th 224, 236-48 (5th Cir. 2026) ("*Black III*"). Plaintiffs contend that HISA was held to be unconstitutional because it gives enforcement "'power *exclusively* to the Authority.'" *See* Opp. at 23 (quoting *id.* at 245). But Plaintiffs quote this line out of context, and properly understood, this line helps Defendant. In the quoted text, the Fifth Circuit was comparing HISA to the Maloney Act[4] and noted how "HISA diverges radically from the Maloney Act in empowering the Authority to sue. The SEC alone has the power to bring civil suits, while HISA gives that power exclusively to the Authority." *Black III*, 178 F.4th at 245 (citations omitted). That only the SEC, and not FINRA, can bring civil suits under the Maloney Act is a key reason why "circuit cases conclud[e] that FINRA's enforcement role presents no private nondelegation problem." *Id.* at 244 (citation omitted). Just like HISA, the CWA "diverges radically from the Maloney Act in empowering [Plaintiffs] to sue." *Id.* at 245. It makes no difference that both EPA and Plaintiffs can enforce the CWA. EPA can do so because its Administrator was properly appointed[5] and is subject to the President's control.

---

[3] Plaintiffs' attempt to limit *Black III* in that it was a "facial challenge . . . not as-applied," *see* Opp. at 23, makes no sense. Facial challenges are more difficult to win, as the "challenger 'must establish that no set of circumstances exists under which the Act would be valid.'" *Black III*, 178 F.4th at 235 (citation omitted). If a statute is facially invalid, *a fortiori*, it is invalid as-applied.

[4] The Maloney Act "allocates authority between the Securities and Exchange Commission ('SEC') and private, self-regulatory organizations (such as the Financial Industry Regulatory Authority ('FINRA'))." *Black III*, 178 F.4th at 234 (citation omitted).

[5] In its alternative Appointments Clause section, Defendant twice cited the *Zafirov* district court opinion. *See* Mot. at 20-21. After the Motion was filed, the Eleventh Circuit vacated the *Zafirov* Appointments Clause holding and remanded the case for the district court to consider Executive Vesting and Take Care Clause arguments. *U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, --- F.4th ----, 2026 WL 2581886 (11th Cir. 2026). *Zafirov* is distinguishable because unlike FCA relators, CWA citizen plaintiffs' duties are not "personal and can[] be assumed by others." *Id.* at *5; *see* Mot. at 21. Although the Motion also cited the *Zafirov* district court on page 6, this portion remains good law, as it quoted *Trump*, which in turn quoted *Huntington*; both of which remain good law.

Plaintiffs cannot do so because "[n]o government official appoints citizen plaintiffs," they "are not employees of the United States," and "[t]hey are not supervised by any federal employee or officer." *See* Opp. at 15.

Unable to distinguish Defendant's cases, Plaintiffs fall back on an opinion that has nothing to do with this matter. Their assertion that "*Morrison* demonstrates that the power to enforce federal law is not reserved exclusively to Executive Branch officials," *see* Opp. at 14,[6] is not a fair characterization of *Morrison v. Olson*, 487 U.S. 654 (1988). The Supreme Court made clear that "the independent counsel" *was* "an executive official." *Id.* at 692. "Independent" did not mean she was outside the Executive Branch. It meant she was "free from executive supervision *to a greater extent than other federal prosecutors*." *Id.* at 696 (emphasis added). If anything, *Morrison* supports Defendant because the Court distinguished the independent counsel's "good cause" termination provision from "a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the 'faithful execution' of the laws." *Id.* at 692. The CWA citizen suit provision *is* a statute that *completely strips* the President of his ability to control Plaintiffs. *See* Mot. at 9-13, 16. Their concession that "[t]hey are not supervised by any federal employee or officer," *see* Opp. at 15, is fatal to their case because *FCC v. Consumers' Research*, 606 U.S. 656, 692 (2025), requires that private actors "'function[] subordinately to' the agency" and be "subject to [its] 'authority and surveillance.'"

**III. The Constitution Limits Congress's Choices of Enforcement Regimes**

Plaintiffs argue that CWA citizen suits are permissible because Congress may create private statutory rights and "'determine in addition who may enforce them and in what manner.'" *See* Opp. at 12 (quoting *Davis v. Passman*, 442 U.S. 228, 241 (1979)). Plaintiffs are wrong for three reasons.

[6] The exact opposite is true. *Trump v. United States*, 603 U.S. 593, 629 (2024) ("[T]he President" is "the sole person charged by the Constitution with executing the laws of the United States[.]").

***First***, the quoted text is taken out of context from a discussion on when courts may infer private causes of action for damages—an issue not relevant to this Motion. *Davis*, 442 U.S. at 238-41. Thus, Plaintiffs ignore the Supreme Court's "admonish[ment] that 'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (citation omitted). Regardless, the Supreme Court has held § 1365 does not contain an implied private cause of action. *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 18 (1981).

***Second***, Defendant does not dispute that (subject to constitutional constraints) Congress may create a private right and then give an individual a private cause of action to seek damages for invasion of that right. But this is not what Congress did through CWA citizen suits, a point that is driven home by comparing them to the citizen suits Congress created in the Surface Mining Control and Reclamation Act ("SMCRA"). Like the CWA, the SMCRA contains a citizen suit provision that allows any person—subject to a notice requirement and diligent prosecution bar—to bring suit "against any other person who is alleged to be in violation of any rule, regulation, order or permit pursuant to this subchapter." 30 U.S.C. § 1270(a)(l). As with § 1365, this SMCRA subsection is constitutionally suspect.

However, the SMCRA departs from the CWA by also allowing "[a]ny person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter [to] bring an action for damages." *Id.* § 1270(f). Plaintiffs seeking to enforce this private right are not subject to SMCRA's notice requirement and diligent prosecution bar. *Id.* § 1270(b)(l) (clarifying its "[l]imitation on bringing of action" applies only to an action "under subsection (a)(l) of this section"). Unlike the CWA, § 1270(f) is an example of

Congress properly creating a private right and allowing purportedly injured persons the ability to vindicate it through a private cause of action. *See* Harold J. Krent & Ethan G. Shenkman, *Of Citizen Suits and Citizen Sunstein*, 91 Mich. L. Rev. 1793, 1795-96 (1993) ("Congress instead may enact private enforcement schemes by creating private, individuated interests, or it can rely on public enforcement subject to its own oversight. Congress may not, however, expand the scope of a private interest so broadly that it becomes coextensive with that of the public."). If the CWA contained a provision analogous to § 1270(f) and Plaintiffs were suing under it, Defendant would not be advancing its arguments.[7] But, as drafted, § 1365 is unconstitutional.

***Third***, Plaintiffs ignore that the Constitution places limits on the laws Congress may enact, as "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, *so long as the exercise of that authority does not offend some other constitutional restriction*." *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) (per curiam) (emphasis added) (citation omitted). Stated differently, "even where a law is necessary, it may still be 'improper.'" *McNutt v. U.S. Dep't of Justice*, 173 F.4th 204, 218 (5th Cir. 2026) (citation omitted); *see* U.S. Const. art. I, § 8, cl. 18. Laws are not "proper" when they "undermine the structure of [the federal] government established by the Constitution." *Landor v. La. Dep't of Corrs. & Pub. Safety*, 146 S. Ct. 1931, 1947 (2026) (alteration in original) (citation omitted); *see* Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L.J. 267, 333-34 (1993) (favorably cited in *Printz v. United States*, 521 U.S. 898, 924 (1997)).

---

[7] This discussion underscores that Defendant does not argue that suits for "'private compensation' through 'civil satisfaction in damages,'" are executive power. *See* Mot. at 7 (citation omitted). Thus, the Court can disregard Plaintiffs' parade of horribles that Defendant's argument would call into question 382 federal statutes. *See* Opp. at 11. The Opposition, *id.* at 12, cites statutes that compensate for damages. *See, e.g.*, 15 U.S.C. § 15(a) ("actual damages"); 15 U.S.C. § 1640(a)(1) ("any actual damages"); 47 U.S.C. § 227(b)(3) ("actual monetary loss"); *Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 381 (4th Cir. 2021) (compensatory damages under 42 U.S.C. § 1983).

Section 1365 undermines our structure of government by violating the private nondelegation doctrine and Article II. *See* Mot. at 5-21. If Plaintiffs' theory were correct, then *United States v. Morrison* would have been decided differently. 529 U.S. at 616-17 n.7 (citation omitted) (holding 42 U.S.C. § 13981's private remedy unconstitutional, over the dissents' Necessary and Proper arguments). Further, § 1365 is not "proper" because it "'violates the principle of state sovereignty.'" *Landor*, 146 S. Ct. at 1947 (quoting *Printz*, 521 U.S. at 924) (cleaned up). Section 1365 violates state sovereignty because States have historically been our Nation's regulators of water pollution. *Sackett v. EPA*, 598 U.S. 651, 659 (2023). In furtherance of this historic power, West Virginia declined to bring a lawsuit, opting instead for a more cooperative solution with Defendant. *See* Compl. ¶¶ 5, 27-28, 30; ECF Doc. 7-1. The Constitution does not allow such improper second-guessing of West Virginia's enforcement actions.

**IV. Plaintiffs Sue to Vindicate Public Rights**

Although Plaintiffs argue they enforce private rights, *see* Opp. at 4-13, what they claim to be doing and what courts have held are two different things. The Motion noted that Plaintiffs "'stand in the shoes of the EPA'" and "'seek relief . . . on behalf of society as a whole'" because "'there is only one claim—the public's claim.'" *See* Mot. at 7 (citations omitted). In fact, Plaintiffs' own case, *see* Opp. at 7, refutes them: "'The thrust of the CWA is to provide *society* with a remedy against polluters in the interest of protecting the environment,'" and citizen plaintiffs "'act[] as private attorneys general.'" *EPA v. City of Green Forest*, 921 F.2d 1394, 1405 (8th Cir. 1990) (citation omitted); *see also Envtl. Conserv. Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) ("ECO assumed the role of private attorney general in the pursuit of its citizen suit," and its "interest in the outcome of the litigation was the public's interest, not an interest specific to ECO or its members."). Thus, citizen plaintiffs are understood "to step into the government's shoes." *StarLink Logistics, Inc. v. ACC, LLC*, 101 F.4th 431, 447 (6th Cir. 2024) (citation omitted).

That CWA citizen suits do not vindicate private rights and instead seek to redress public wrongs through public remedies is underscored by the fact that any civil penalties recovered go to the U.S. Treasury, and the existence of the notice requirement and diligent prosecution bar. If CWA citizen-plaintiffs were trying to vindicate private rights, they would not need to notify the EPA Administrator and delay bringing suit, and the Administrator would not be able to bar them from vindicating their private rights. Instead, the diligent prosecution bar operates as "a tell": potential citizen-plaintiffs need to notify the Administrator because CWA citizen suits seek to vindicate public rights and, thus, constitute exercises of executive power. *See* Mot. at 6-8.

Resisting this, Plaintiffs argue that they sue for private rights because they sue "in their own names." *See* Opp. at 18. But whether a "power" is "executive" does not turn on how a case is captioned. After all, the "'Constitution deals with substance, not shadows.'" *Trump*, 603 U.S. at 631 (citation omitted). And the substance of Plaintiffs' Complaint is executive power. Indeed, by noting "[t]he remedies available in citizen and EPA enforcement actions are the same—injunctions and civil penalties," *see* Opp. at 9 (citations omitted),[8] they effectively concede as much. If EPA brought this suit, no one would deny it was exercising executive power. After all, the FTC and CFPB in *Slaughter*, 146 S. Ct. at 2305, and *Seila Law*, 591 U.S. at 206, respectively, could pursue civil penalties and injunctions through civil enforcement actions, and this was held to be executive power. As citizen suits also seek civil penalties and injunctions and "are enforcement actions," *Glynn Envtl. Coal., Inc. v. Sea Island Acquisition, LLC*, 146 F.4th 1080, 1091 (11th Cir. 2025) (Pryor, C.J., concurring) (citation omitted), they too are executive power.

---

[8] Plaintiffs are wrong that "[i]njunctions and civil penalties are alternative remedies." *See* Opp. at 10. Rather, "[t]he citizen suit provision suggests a connection between injunctive relief and civil penalties." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 58 (1987).

Plaintiffs' contention that the CWA is essentially a nuisance action, *see* Opp. at 8, is contradicted by statutory text and precedent.[9] In contrast to the CWA's strict liability permitting regime, nuisance liability attaches to "'conduct that is intentional and unreasonable, negligent or reckless, or that results in an [*sic*] abnormally dangerous conditions or activities in an inappropriate place.'" *Bansbach v. Harbin*, 229 W. Va. 287, 290-91 (2012) (citation omitted). For these reasons, multiple circuits have confirmed environmental citizen suits are not the same as nuisance. *N.C., ex rel. Cooper v. TVA*, 615 F.3d 291, 302 (4th Cir. 2010) ("The contrast between the defined standards of the Clean Air Act and an ill-defined omnibus tort of [public nuisance] could not be more stark."); *see Sierra Club v. EPA*, 60 F.4th 1008, 1020 (6th Cir. 2023) (discussing CAA citizen suit provision and stating the "two kinds of lawsuits have different goals and seek different remedies" (citations omitted)). Section 1365(e) itself implies they are different, as its savings clause preserves "common law" claims, including nuisance. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987) ("[N]othing in the Act bars aggrieved individuals from bringing a nuisance claim[.]").

Finally, Plaintiffs' Complaint is not saved by the fact that "EPA can enforce both 'wholly past' *and* continuing violations, while citizens can only enforce violations that are continuing." *See* Opp. at 8. A power wielded by a citizen plaintiff does not cease to be executive just because it is only part of the suite of governmental power. After all, the Supreme Court "long ago abandoned the notion that there are some powers that are only *partly* executive." *Slaughter*, 146 S. Ct. at 2302.

---

[9] Plaintiffs misquote *Tull* in claiming that the Court "stated that CWA citizen claims 'resemble' public nuisance claims." *See* Opp. at 8. Instead, "[t]he Government argue[d] that the present suit [was] analogous to two species of public nuisances" involving "public waterways" and "the environment." *Tull v. United States*, 481 U.S. 412, 420 (1987). The Court stated "*the subject matter of this Clean Water Act suit*—the placement of fill into navigable waters—resembles these two species of public nuisance." *Id.* (emphasis added). Further, that "'[t]he *objective* of [the CWA] *is in some respects* similar to that sought in nuisance suits,'" does not transform this action into a nuisance suit. *See* Opp. at 8 (emphasis added) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 n.7 (1982)).

The Court should reject this backdoor attempt to unearth the "quasi" labels that *Slaughter* buried. A power either is, or is not, "executive power—no ifs, ands, or quasis about it." *Id.* No court would "allow intrusions on Article I nor on Article III," and there is "no reason to allow intrusions on Article II either." *Id.* at 2310 (citations omitted). This is not a suit for private rights. Instead, it is improper "second-guessing [that] would 'threaten the independence or effectiveness of the Executive,'" which our Constitution does not allow. *Trump*, 603 U.S. at 632 n.3 (citation omitted).

## V. Section 1365 Is More Constitutionally Suspect Than FCA *Qui Tam* Suits

Plaintiffs note that multiple courts have upheld the constitutionality of the FCA's *qui tam* statute. *See* Opp. at 17-18. This does not salvage the constitutionality of CWA citizen suits, as the constitutionality of § 1365 is more suspect than the FCA *qui tam* statute. At least with the FCA, the Government can intervene and dismiss an FCA *qui tam* action at any time over the relator's objection. *Polansky*, 599 U.S. at 424. Section 1365(c)(2) intervention does not provide this level of control. *See* Mot. at 10-11. Moreover, the FCA gives the Government the power to (1) extend the 60-day seal period; (2) "reach a settlement with the defendant, even over the relator's objections"; (3) "move the court to limit the relator's participation"; (4) "require the relator to serve it with copies of all filed pleadings and all deposition transcripts"; and (5) "move that certain discovery actions by the relator be stayed for sixty days, and the motion may be renewed." *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1035 (6th Cir. 1994). Neither this Court nor Amsted needs to take a position on the FCA *qui tam* statute's constitutionality, but it is unquestionable that the FCA provides the Executive Branch far more control. *See* Mot. at 10-12.

## VI. Plaintiffs' Reliance on a Law Journal Article Is Misplaced

Plaintiffs' reliance on a recent law journal article, *see* Opp. at 1, 11, 20-21 (citing Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Cal. L. Rev. 131 (2026)), is misplaced. The article refutes Plaintiffs' assertion that they sue to vindicate private rights, as it

characterizes CWA citizen suits as a "regime[] of private enforcement for *public wrongs*." Baronia, et al., *supra,* at 193 (emphasis added); *see id.* at 141 ("A clear example of private enforcement for a *public harm* is the . . . CWA[]." (emphasis added)). Also, it proffers the following test for determining which statutes violate Article II:

> Causes of action that extract a punitive public remedy, such as damages paid directly to the public fisc as punishment . . . may be constitutionally suspect if the statute is designed with few practical limitations on the way in which a cause of action can be brought and procedures by which the Executive can exert some control over it.

*Id.* at 186-87. If this sounds familiar, it is because it substantially overlaps with Defendant's arguments. *See* Mot. at 5-18.[10]

To the extent the article relies on the pre-ratification English practice of *qui tam* to determine what private enforcement regimes are compatible with Article II, Baronia, et al., *supra*, at 153-58, this Reply already refuted this argument. *See supra* pp. 3-4. To the extent the article relies on early American state/colonial practices to interpret Article II, Baronia, et al., *supra*, at 158-69, it ignores that the Framers sought "to depart from rather than adhere to" pre-ratification State constitutions, *United States v. Rahimi*, 602 U.S. 680, 720 (2024) (Kavanaugh, J., concurring), because they lacked strong, independent executives comparable to the President created by Article II. *Slaughter*, 146 S. Ct. at 2293 ("The Framers chose to depart from this model, for they had seen its flaws up close."). And of all the early States the article could have focused on, its focus on Massachusetts, Baronia, et al., *supra*, at 163-69, is especially misplaced because its 1780 Constitution lacked a vesting clause comparable to that in Article II. *Compare id.* at 159-60 &

[10] The article claims citizen suits are constitutional due to the CWA's "combination of *intervention*, *notice*, and *review of settlements*," Baronia, et al., *supra*, at 193, but this argument cannot be squared with *Consumers' Research*. *See* Mot. at 8-13. The article inexplicably fails to discuss *Consumers' Research*, which was decided seven months before the article was published and clarified the controlling test for private nondelegation challenges. Regardless of the article, it is *Consumers' Research* which binds the parties and this Court.

n.166 (quoting Mass. Const. of 1780, pt. 1, art. XXX), *with* U.S. Const. art. II, § 1, cl. 1. Thus, whether early State enactments infringed on the powers of State Governors is not dispositive because "the Framers hardly viewed State Governors as a reliable guide in fashioning the Federal Executive." *Seila Law*, 591 U.S. at 227 n.10; *see Slaughter*, 146 S. Ct. at 2293 ("The Convention was determined not to make the same mistake" as the early States, which "had but . . . nominal Governor[s.]").

## VII. Prior Executive Views Receive No Deference

Plaintiffs' citation to five briefs where the Executive "support[ed] the constitutionality of citizen suits," *see* Opp. at 9, does not move the needle. This summer, the Executive filed briefs questioning the constitutionality of the Clean Air Act's citizen suit provision. *NAACP v. x.AI*, No. 3:26-cv-74, ECF Docs. 59, 86, 102 (N.D. Miss.). Plaintiffs' failure to grapple with the Executive's current position is inexplicable because Defendant alerted the Court to it. *See* Mot. at 22 n.16. Even if the Executive had not altered its position, its prior acquiescence to Congress's separation of powers violation would not have been entitled to deference. "The constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States." *New York v. United States*, 505 U.S. 144, 182 (1992); *see Slaughter*, 146 S. Ct. at 2309 ("[T]he political branches [cannot] amend by agreement 'integral parts of the constitutional design.'" (citation omitted)). After all, "powerful incentives might lead . . . federal . . . officials to view departures from the federal structure to be in their personal interests." *New York*, 505 U.S. at 182; *see also United States v. Arthrex*, 594 U.S. 1, 30 (2021) (Gorsuch, J., concurring in part). This is why "[i]t is emphatically the province and duty of the judicial department [not the Executive] to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). For these reasons, the Court should grant the Motion to Dismiss.

DATED: September 23, 2026.

Respectfully submitted,

*/s/ Peter Raupp*

Peter Raupp, Esq. (WVSB #10546)
David M. Flannery (WVSB #1216)
Kathy G. Beckett (WVSB #4998)
Allyn G. Turner (WVSB #5561)
Steptoe & Johnson PLLC
Chase Tower, 17th Floor
Post Office Box 1588
Charleston, WV 25326-1588
Telephone: (304) 353-8000
Facsimile: (304) 353-8180
Peter.Raupp@Steptoe-Johnson.com
Dave.Flannery@Steptoe-Johnson.com
Kathy.Beckett@Steptoe-Johnson.com
Allyn.Turner@Steptoe-Johnson.com

And

Sean J. Radomski* (Pa. Bar # 319732)
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 1000
Arlington, VA 22201
(202) 888-6881
sradomski@pacificlegal.org

Damien M. Schiff* (Cal. Bar #235101)
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111
dschiff@pacificlegal.org

*Pro Hac Vice

*Counsel for Amsted Graphite Materials LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| WEST VIRGINIA RIVERS COALITION and WEST VIRGINIA HIGHLANDS CONSERVANCY,<br><br>Plaintiffs,<br><br>v.<br><br>AMSTED GRAPHITE MATERIALS LLC,<br><br>Defendant. | No. 1:26-cv-00046-TSK |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2026, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which is understood to have sent notification of such filing electronically to all counsel of record.

*/s/ Peter Raupp*
*Attorney for Defendant*